PEOPLES PROTECTIVE LIFE INSURANCE
COMPANY, Appellant, v. L. L. NEUHOFF, Appellee.
—407 S.W.(2d) 190.

Middle Section, at Nashville.  April 29, 1966.

Certiorari Denied by Supreme Court September 6, 1966.

L. L. Fonville, Jackson, William J. Harbison, Nashville, for appellant.

Eugene Jackson, Jr., Nashville, for appellee.

HUMPHREYS, J. Plaintiff, Neuhoff, recovered a verdict against defendant, Peoples Protective Life Insurance Company, for malicious prosecution, in the amount of $12,200.00 compensatory damages and $5,000.00 punitive damages, for a total judgment of $17,200.00.

On motion for a new trial, this judgment was set aside and a new trial ordered, because of the excessiveness of the verdict and, because the trial judge was of opinion he had committed error in permitting the introduction of certain evidence over defendant's objection.

However, defendant's ground of motion, that the trial court erred in disallowing its motion for a directed verdict was overruled.

On the second trial, plaintiff recovered a verdict for $10,000.00 compensatory damages, and $20,000.00 punitive damages, for a total judgment of $30,000.00.

On motion for a new trial, $15,000.00 of the punitive damages was remitted, and both parties have appealed.

Plaintiff complains in this Court of the remittitur, and seeks restoration of all or a part of it, and defendant complains that there was error in the first trial in that its motion for a directed verdict on grounds of probable cause and advice of counsel was overruled. And that the same error and other errors were committed in the second trial.

The facts out of which this suit arose are as follows:

Plaintiff, Lawrence L. Neuhoff, aged approximately fifty-three years at the time of the events involved here, was an employee of the Life Insurance Company of Georgia, as a debit agent, having worked for this company in this capacity since 1950. For several years prior to 1963, plaintiff had known and worked with one Robert Poole, who at that time was also an employee of the Life Insurance Company of Georgia. Plaintiff had also known Donald R. Maddux for about the same time, Maddux also being an employee of the Life of Georgia.

Plaintiff testified that he had loaned Poole some money prior to February, 1962. Poole was unable to repay him, so plaintiff co-signed a note for Poole to enable Poole to borrow the money at the First American National Bank, and so repay him. Poole later defaulted on this note and Neuhoff had to pay it. Poole still owed plaintiff this debt when he left the Life of Georgia to go to work for defendant company, about one year before the events here involved.

Neuhoff testified that he had had no contact with Poole for several months prior to the night of April 4, 1963, when Poole called him by telephone at his home. He testified that Poole called him about nine o'clock in the evening and "wanted me to meet him in front of our office

on 21st Avenue South, said he had some money coming and was going to pay me the money he owed me."

Neuhoff lived about three blocks from the Life of Georgia office, and he drove over there and met Poole on the street in front of the office, between 9:00 and 9:30 P.M. The two men did not go into the office. Neuhoff described the conversation between himself and Poole as follows:

"Q. And then what did he want you to do?

"A. When I got up there, he didn't have the money, he said it was in some checks.

"Q. All right.

"A. And he had to get the checks cashed before he could pay me from them.

"Q. All right, What did he want you to do, Lawrence?

"A. I said, well, can't you get the checks cashed at the bank, and he said I don't know anybody at the bank, and I said, Well, I'll identify you." (WB 43-44)

Neuhoff testified Poole did not tell him the kind of checks he had, or that they were insurance claim checks. In spite of the fact that Neuhoff was an experienced insurance man, and had been called out late in the evening to a sidewalk conference involving the cashing of checks, Neuhoff said he made no inquiry as to the kind of checks Poole had or how he had gotten possession of them. He testified, "I wasn't concerned about it, actually."

Poole and Neuhoff agreed that Poole would call Neuhoff at the latter's office the next morning and arrange to get the checks cashed. They agreed to meet at Marchetti's Restaurant and then go to a bank.

Before leaving his office the next morning, Neuhoff called the Assistant Manager of the Charlotte Avenue Branch of the First American National Bank, one Ernest Johnson, at whose bank he ordinarily did business, and told him that a friend of his wanted to get some checks cashed and that he would bring him out and identify him. Thereafter, according to Neuhoff, he met Poole at Marchetti's on 19th Avenue South and drove with him to 51st Avenue without ever seeing the checks, inquiring about them, or ascertaining their validity. With respect to this, he testified again, "it didn't concern me, actually."

Mr. Ernest Johnson, testifying for Neuhoff on the first trial, said with respect to this:

"Q. Well, tell us the best recollection you can about what the substance was of the phone conversation.

"A. Well, the best I can recollect, I mean, he called some time in the morning, and wanted to know if I was going to be in the office that day. I mean, whether I was going to be gone any time. And I told I would. And that he had someone, and I don't remember how much in detail we went into it, that wanted me to cash some checks. And we went into it to the extent of who the checks were payable to, and were they endorsed, etc. But how much so, exactly what was said, I don't remember.

"Q. But he did give you some information about who they were payable to, whether they were endorsed.

"A. Well, I questioned whether or not it was the payee of the checks, and had the payee endorsed the checks, etc., so that everything—the trip wouldn't be wasted, in other words.

"Q. Did he tell you the payee had endorsed the checks?

"A. I believe so, yes sir." (WB 134)

■ However, Neuhoff's testimony is to the contrary of this, and even this witness, Mr. Ernest Johnson, so qualified his testimony on redirect examination, as to make it more or less agree with Neuhoff, so that under the rule of law requiring us to take that view of the evidence most favorable to the party who has gotten the jury verdict, we must and do assume that all Mr. Neuhoff did was to identify Poole to the bank official. As Poole and Neuhoff left the bank, Poole handed Neuhoff three one hundred dollar bills, and they drove back to Marchetti's. Poole testified he gave Neuhoff $450.00 at this time. But with Neuhoff's denial of this, we accept his testimony that he received only $300.00. However, he did not give Poole a receipt, return Poole's note or mark it paid, or make any other record of the transaction. According to his testimony, they drove back to the restaurant and never discussed the matter any further. The checks cashed at the bank were three in number, one for $2,000.00, one for $1,000.00, and one for $500.00. They were drawn on defendant, Peoples Protective Life Insurance Company, dated April 2, 1963, and were payable to the order of Barbara Barnes. The name Barbara Barnes was endorsed on the back of each check, and when the checks were cashed, Robert E. Poole endorsed each of them.

Poole had gotten possession of the checks by a fraud practice by Poole, Maddux, Van Hooser, and other employees of Peoples Protective Life Insurance Company. This fraud was practiced in this manner: Two applications for insurance on one Albert Barnes and family had been taken by Van Hooser, a company agent, on February

5, 1963. The policies had been issued by the company but had not been delivered when Barnes and two of his children suffered injuries in a fire from which they subsequently died. Then, these agents conceived the idea of sending in false claim papers, collecting the insurance proceeds and dividing the money among themselves. This they did, and the company issued the checks payable to Mrs. Barnes under date of April 2, 1963. The checks totalled $4,000.00, and as has been said, Poole, with Neuhoff's identification, negotiated checks totaling $3,500.00, while the other check for $500.00 was cashed by another company agent in a different manner, but as part of the overall fraud that was practiced.

There is no question but that the endorsement of Mrs. Barnes was forged on the claim checks, as she never saw them at any time. The proof is that after Neuhoff received the repayment of the loan he had previously made to Poole, the balance of the money was divided up among the conspirators.

When the claim checks had cleared the bank and had been returned to the company in Jackson, they, together with the file, were referred to one Leo Ely, claims investigator for the insurance company. He noticed that the checks purported to bear endorsement by Poole, the company's agent, as well as that of Mrs. Barnes, and since this was out of the ordinary, began to look into it. Upon examining the claim papers and comparing signatures on various insurance documents, he testified, "there seemed to be a good deal of discrepancies all the way round".

Mr. Ely then came to Nashville to investigate the Barnes claim, and discovered his company had been vic-

timized by the fraudulent scheme we have outlined above.

On the morning of June 28, 1963, Mr. Ely submitted the results of his investigation, which pertained only to the company's own personnel, to the company's attorney in Nashville, and he then contacted the Chief of Detectives of the Metropolitan Police Department in Nashville. This sulted in two detectives, Reasonover and Pruett being assigned to the case. Ely and two other company officials had rooms at a Nashville motel, and the detectives went there to review the file. Ely had discovered other irregularities besides the Barnes death claim, and he went over these with the detectives. According to Mr. Ely's testimony, which is corroborated by that of Assistant District Attorney General Howard Butler and Detective Reasonover, the detectives and Assistant District Attorney General Butler, who came into the investigation later on, took charge of the investigation and conducted it from that time on. During the afternoon and evening of that day, June 28, 1963, several suspected company personnel were interrogated. One of these was Robert Poole. He was interrogated at length about the Barnes case and other matters and, after being advised of his constitutional rights, gave a detailed, signed statement which, insofar as it involved the Barnes case and plaintiff Neuhoff, is as follows:

"Statement of Robert Eugene Poole, 3038 Hummingbird Rd., Bordeaux, Tenn. taken by Leo Ely June 28, 1963 direct to the typewriter.

I, Robert Eugene Poole, having been advised that I may make or not make a statement in connection with this investigation and that if I do make a statement it can be used against me in a court of law and without

any promise of favor or reward and without any force or duress and having been advised of my constitutional rights wish to make the following statement of my own free will and accord for the sole purpose of telling the truth.

I have been working for the Peoples Protective Life Insurance Company for approximately ten months, having started as an agent and was promoted to staff manager Jan. 1, 1963.

I have been questioned about sick claims, policies which were surrendered and various other false and fraudulent claims and things against the company and as best I can remember the following are the only matters in which I am directly or indirectly involved. . . .
. . . . . . . . . . . . . . . . . . . . . . (Part of statement omitted)

At this point, Billy VanHooser was brought into the room where this statement is being given and listened to all that Robert Eugene Poole had to say with reference to the death claim of Albert C. Barnes.

Sometime in the month of February of this year Billy Sam VanHooser, who was an agent of Peoples Protective Life Insurance Company at that time wrote the application for two policies, on the family of Albert E. Barnes and the other on the life of Albert E. Barnes singularly, which applications were dated Feb. 5, 1963. The policy on the life of Mr. Barnes was in the amount of $1,000.00, insuring him against accidentally being killed for that amount. The family group policy insured Mr. Barnes for $1000.00 for natural death and each other member of his family for $500.00 for natural death. The policy would pay double indemnity for accidental death of any member of the family over five

years old. At the time the policies were issued I did not know that such policies were in existence.

On February 22, 1963 Mr. Barnes house caught fire at which time two children were burned to death and Mr. Barnes was hospitalized as a result of the fire. While Mr. Barnes was still in the hospital and prior to his death VanHooser told me that ''We had a death claim coming up and we could make some money.'' Van-Hooser explained to me at that time about the policies of insurance on Barnes and his family and I told him that we would get into trouble by fooling with them. About two or three days later Mr. Barnes died. We all knew this at the office as it was in the paper and it was being discussed by several agents of the company. The next information that I had was when Donald R. Maddux, another agent of the company, told me that the death claims had been submitted to the home office and that he hoped that they would be satisfactory. Before the checks were returned by the home office to the Nashville office Maddux and I agreed that we would cash the checks and divide the proceeds between VanHooser, Maddux, myself and Joe Cook, who had since learned the claim was being paid.

Prior to the time that the checks were received at the district office VanHooser had left the company and I did not know where he had gone. We had planned to split the $4,000.00 four ways, less the amount we would have to pay for getting the checks cashed, which we thought would be about $50.00. Prior to the time that the checks came in Maddux and Cook asked me if the checks had come in. Sometime the first part of April the checks were received at the district office. On that same day Cook, Maddux, and I discussed having Mr.

L. L. Neuhoff, an agent for the Life of Georgia Life Insurance Company getting the checks cashed for us. Before I left the office I called Mr. Neuhoff at his home and asked him to meet us at his office. Cook and I left Mr. Maddux at the office and went and met Mr. Neuhoff in front of his office on 21st Ave. South. Cook stayed in his car. *I got in Mr. Neuhoff's car with him and told him the whole story.* Mr. Neuhoff stated they were pretty large checks and that he didn't know if he could get them cashed or not and I told him I would make it worth his while if he did and told him I would give him $100.00 if he would get them cashed. He told me that he could not do it for $100.00—that he would have to have more money than that. I owed him about $180.00 on a note which he had paid for me over a year ago and he told me that if I would give him $450.00 that that would pay everything to which I agreed. He told me that he would call me at my office the following morning and let me know if he could get the checks cashed or not. At that point Mr. Neuhoff left and Cook and I drove back to the office at which time Cook called his account. At that time I still had in my possession the four checks, as follows: Two for five-hundred ($500.00) each; one for one-thousand ($1000.00); and one for two-thousand dollars ($2000.00).

What I mean by calling an account is as follows: Putting all the transactions on a form which goes to the home office for their records, and shows the agents transactions for the week up to that point. In our office we usually call the accounts on Thursday and turn them in along with our collections. At that time we also decided to make an application for a policy to Mrs. Barbara Jean Barnes, the widow of Albert Barnes, just to make it look good. One of us signed her name to the

application for the policy and we made an entry in the account sheet for $240.00 as an advance premium on the applied for policy for two years. I gave Cook one of the $500.00 checks and he gave me back $260.00. As well as I can remember, before we left the office that night Maddux came back by the office and we told him we would be able to get the checks cashed the next day. After that I went home taking with me the three remaining checks and the $260.00 which Cook had given me.

The next morning Mr. Neuhoff called me and told me to meet him at Marquettes (sic) Restaurant which is located on 19th Ave. So. between West End Avenue and Broad St. Mr. Maddux and I went in his automobile and I got in Mr. Neuhoff's automobile and we went to the West Nashville branch of the First American National Bank on Charlotte Avenue. On the night before Maddux had endorsed these four checks, forging the name of Barbara Barnes. When we arrived at the Bank Mr. Neuhoff told me to wait in the lobby of the bank and he went and talked to one of the officials of the bank. Directly, he and this official came back to where I was and told me to give the checks to the bank official. This bank official then had me endorse the checks and I signed my name as having witnessed the signature of Barbara Barnes at which time the bank official okeyed the checks and I carried them to the bank teller and got them cashed.

On the way back to Marquettes (sic) restaurant I gave Neuhoff $450.00 of the money which left me $3310.00. When we got back to the restaurant Neuhoff told me not to say anything about it or to ever mention his name or what he had done, which I agreed to do. I

got back in the car with Maddux and gave him $2000.00, one $1000.00-bill and ten $100.00-bills. I understood that $1000.00 was for VanHooser and Maddux was to keep $1000.00 for himself. This left me $1310.00. Maddux and I agreed that we would keep this to ourselves and say nothing to no one about it. When we got back to the office I gave Cook $400.00 which left me $910.00. Maddux told me that he was supposed to see Van-Hooser that afternoon and deliver him his $1000.00 and later he told me he had given the $1000.00 to VanHooser. After that, from time to time, Cook, Maddux, and I would discuss whether or not anything had been said about it and tonight is the first time I have seen Van-Hooser since he left the company.

I have read the foregoing four pages plus two paragraphs of single-spaced typewritten pages and I find it all to be true to the best of my knowledge, belief, and recollection. I swear it is all true.''

Exhibit # 1, Cross-Examination of Witness Wehby

It should be stated, and emphasized, that neither Mr. Ely nor any of the other officials of the defendant company were acquainted with Neuhoff, or even knew there was such a person, until Poole implicated him in his statement.

While Poole was making his statement with respect to the Barnes claim, VanHooser was brought into the room, and he signed a statement confirming, generally, Poole's statement insofar as his role in the Barnes claim was concerned.

After Poole's statement had been completed, the uncontradicted evidence is that Assistant Attorney General

Butler suggested that Neuhoff be sent for and brought over for interrogation. General Butler testified:

"Q. Gen. Butler, you remember when and under what circumstances the name of Mr. Neuhoff came into the investigation?

"A. Yes, sir, it was during the interrogation of one of these men, they named Mr. Neuhoff as one of the co-conspirators.

"Q. Did you give instructions about having him arrested?

"A. Yes, sir.

"Q. Tell what you did.

"A. I asked the detectives to go get him so we could confront him with this accusation of these men.

"Q. Was that done?

"A. Yes, sir."        (WB  307-308)

This is corroborated by the testimony of Mr. Reasonover as follows:

"Q. Now, following that, were you given any instructions about Mr. Neuhoff?

"A. Well, it was later on that night, we picked up two or three other agents, then we had instructions, Gen. Butler told me to pick up Mr. Neuhoff.

"Q. Was it on Gen. Butler's instructions you picked him up?

"A. Yes, sir."  (WB 295-296)

Detectives Reasonover and Pruett, accompanied by Mr. Smith, an official of defendant company, went to Neuhoff's home, arriving there about 10:00 P.M. One of the detectives asked Neuhoff to accompany them to the motel,

and Neuhoff went with them. He was not arrested, and went voluntarily.

At the motel, Neuhoff told Butler about cashing the checks with Poole, and then was asked to wait. Neuhoff testified that while he was waiting Mr. Ely asked him to make a confession. Neuhoff was then taken into the room, with Poole, and was confronted with Poole's statement. At this time, Neuhoff made a statement detailing his involvement in getting the checks cashed, in the course of which he denied any knowledge of the nature of the checks that were cashed, or knowing of any forgery or other wrongdoing in connection therewith.

After interrogation, according to General Butler's testimony, he recommended that forgery charges be placed against Mr. Neuhoff, as a result of which Neuhoff was taken by the detectives to the Davidson County Courthouse where they swore out warrants for his arrest and the arrest of the others involved. However, according to Mr. Neuhoff's testimony, General Butler, after asking Neuhoff what he thought a jury would think about a story like he had just told, turned to Mr. Ely and said ''What do you want to do with him?'' and Mr. Ely said, ''We'll prosecute him''.

And, it should be mentioned that Neuhoff also testified that Poole said to him at a time Ely was in the same room, ''They have had me sweating for ten hours,'' ''They have tried to charge me with murder.'' Mr. Ely denied hearing Poole make such a statement, and all of the witnesses except Neuhoff testified that Poole was not ''sweated'', and made his statement voluntarily.

It appears from the record that the Fire Marshal's Office was interested in the fire in which the three in-

sureds lost their lives, and that a representative of that office was present during a part of the time Poole was being interrogated, and this may account for some of the inquiries Poole was talking about.

On the following day, General Butler discussed the case with District Attorney General Harry Nichol, turning over the complete file to him. This included the statements of the men involved and Butler's own memorandum of a statement made by Donald Maddux, who had been at Marchetti's Restaurant with Poole when Poole and Neuhoff left to get the checks cashed. General Nichol then later discussed the case with the detectives and Mr. Ely. Thereafter, he made a detailed memorandum of the facts of the case as obtained from the documentary evidence and his interviews and concluded from the evidence at hand that a presentment should be prepared charging the five persons involved, which included Neuhoff, with conspiracy. This charge was prepared in the form of a presentment, as no arrest warrant had been issued on a conspiracy charge, and a presentment was returned by the grand jury. While the record does not disclose who appeared before the grand jury, it does disclose that Mr. Ely was subpoenaed and did appear, taking with him the statements taken on June 28th.

The criminal case was then tried on October 2-4, 1963, about three months after the presentment was returned, and Poole, VanHooser and Maddux were found guilty, while Neuhoff and Cook were acquitted.

On the morning of the trial an effort was made to settle the presentment by Maddux, Poole, and VanHooser pleading guilty, with the cases against Neuhoff and Cook to be dismissed, or nollied. However, no such settlement was consummated as Ely and the defendant company

were not agreeable to this disposition of the case. In this connection it must be mentioned that nothing had occurred during the three months following the investigation reflecting on the facts produced in the investigation, and no new evidence had been discovered or was available reflecting any further or differently upon the guilt or innocence of the accused persons.

It was brought out that, during this discussion, Mr. Ely stated the insurance company would not oppose a suspended sentence for Poole if Poole would testify against Neuhoff and that Ely stated "We are not after you boys, we are after that bird from the Life of Georgia."

The prosecution was conducted by the Attorney General and, while there was an attorney for the company in the courtroom, he did not actively participate in the trial.

The defendant company's motion for a directed verdict at the conclusion of the proof in the first trial was predicated on two grounds, that plaintiff Neuhoff had not shown defendant acted without probable cause but, to the contrary, defendant had shown by uncontradicted facts and circumstances that it had acted on probable cause; and, upon the further ground that it had made a full and complete disclosure of all of the facts and circumstances within its knowledge, or which could be discovered by the exercise of due diligence, to both Assistant District Attorney General Howard Butler and District Attorney General Harry Nichol, and both of these officials, each of whom is a lawyer, had advised that Neuhoff be prosecuted along with the others involved in the Barnes fraud.

██ The law with respect to actions of this sort was settled in Tennessee years ago. In Dodge v. Brittain, 19

Tenn. 84, it was said that if an innocent man be maliciously prosecuted for a felony, he cannot maintain the action of malicious prosecution, if there is probable cause for preferring the charge. Again, in Raulston v. Jackson, 33 Tenn. 128, it was said that the question in an action for malicious prosecution is not whether the plaintiff in such action is really guilty of the crime alleged against him, but whether reasonable grounds existed for the defendant to believe him so. That it might often turn out that no crime had, indeed, been committed, and yet the prosecutor be justifiable, because of the existence of reasonable grounds to believe that the crime had been committed, and that the party accused was the guilty agent.

■ In Poster v. Andrews, 183 Tenn. 544, 194 S.W.2d 337, probable cause for prosecution is said to consist of the existence of such facts and circumstances as would excite in a reasonable mind a belief that the person charged with crime was guilty thereof. And, in Bry-Block Mercantile Co. v. Proctor, 13 Tenn.App. 45, it was held that where a manager of Bry-Block Mercantile Company's store was advised by the manager of a store department that a clerk had been taking merchandise, and the manager secured statements from other clerks to this effect, and consulted an attorney, that probable cause existed to have the clerk arrested.

■■ In Kendrick v. Cypert, 29 Tenn. 291, it was said that to maintain this action, the plaintiff must show the absence of probable cause for commencing the prosecution; that is, the absence of such a state of facts as would excite in a reasonable mind the belief that plaintiff was guilty of the offense charged against him. He must also show that defendant was actuated by malice; that is not by hatred, but by indirect and improper motives. But,

that malice would be inferred from the absence of probable cause.

Again, in Pharis v. Lambert, 33 Tenn. 228, it was said that in order to authorize an action for malicious prosecution, it must appear: (1) That the prosecution is ended; (2) that there has been an acquittal or final discharge; (3) that the charge was made through malice, and without reasonable or probable grounds to believe it true. But that malice may be inferred from the want of any reasonable grounds for the prosecution, as the circumstances appeared to the prosecutor, or as they would have appeared by ordinary circumspection and diligence on his part at the time he acted.

In Nashville Union Stockyards, Inc. v. Grissim, 13 Tenn.App. 115, these rules were discussed again by this Court and it was there said that while law will infer malice from the total absence of probable cause, the want of probable cause cannot be inferred from malice so as to render plaintiff liable for malicious prosecution. That if there is reasonable cause to prosecute, the state of mind is immaterial.

With respect to the defense of advice of counsel, in Cooper v. Flemming, 114 Tenn. 40, 84 S.W. 801, 68 L.R.A. 849, it was held that where the advice of counsel has been honestly sought on all the material facts relating to the case, ascertainable by the exercise of due diligence, and a prosecution is commenced in pursuance of such advice, the prosecutor is entitled, as a matter of law, to immunity from damages as for malicious prosecution. And in this case it was also held that the District Attorney General is counsel whose advice can constitute a defense to an action for malicious prosecution, where

based upon a full and honest presentation of the material, ascertainable facts.

This is in accord with Prosser, Law of Torts, sec. 98, p. 655, "Prosecuting attorneys * * * are at least as well qualified to give advice on criminal proceedings as any others, and it is agreed everywhere that their advice is sufficient to establish probable cause."

And, finally, we call attention to quotations from Cohen v. Ferguson, 47 Tenn.App. 165, 176, 336 S.W.2d 949, 954:

"One who causes another's prosecution by false statements or misrepresentations, made to a police officer, with an improper motive, is liable for malicious prosecution, although he does not file a complaint or actually procure the prosecution. Where, however, he discloses in good faith, to a police officer, or other public officer, all facts within his knowledge having a material bearing on the question of the guilt of the person suspected and leaves it to the officer to act entirely on his own judgment and responsibility as a public officer as to whether or not there shall be a criminal prosecution, he is not liable in an action for malicious prosecution by reason of the erroneous conclusion of the officer that the facts warrant him in instituting a criminal prosecution."

"The question is not whether the defendant is really guilty, but was there good and reasonable grounds for the prosecutor to believe he was. * * *

"Instead of requiring direct evidence of the fact of the crime, it may certainly often happen that no crime was in fact committed, and yet the prosecutor justifiable, because of the existence of probable or reason-

able, grounds to believe the criminal act had been done, and by the accused. If men were not allowed to act upon such grounds, crimes would often go unpunished for want of prosecutors. This action is only intended to apply to cases where a criminal accusation is made against an innocent man through malice, and in the absence of even a fair and reasonable probability of its truth.''

The conduct of the defendant

''is to be weighed in view of what appeared to him at the time of instituting the prior proceeding, not in the light of subsequently appearing facts.''

■ And, finally, we make mention of the settled rule of law that where the facts from which probable cause is to be deduced are undisputed, the determination of probable cause is exclusively for the court; first, for the trial court, and then for this Court. Nashville Union Stockyards, Inc. v. Grissim, 13 Tenn.App. 115; F. W. Woolworth Co. v. Connors, 142 Tenn. 678, 222 S.W. 1053; Bankhead v. Hall, 34 Tenn.App. 412, 238 S.W.2d 522.

These being the settled rules of law, we are of opinion the trial judge should have sustained the defendant company's motion for directed verdict on the grounds of probable cause to prosecute and prosecution on advice of counsel.

■ Bearing in mind that probable cause must be determined from the facts as they existed at the time of the prosecution, it appears without question, that as the facts appeared to the defendant company, plaintiff Neuhoff had been involved as an active participant in a criminal fraud against it whereby $4,000.00 had been

obtained by means of forgeries and false misrepresentations.

It must be remembered that these accusations were made against Neuhoff by Poole, a person in whom the company had already shown it had trust and confidence, as indicated by its having made him its staff manager in the Nashville office. So, the accusation, so far as the company was concerned, did come from one who up to that time, had been considered by it to be responsible.

Moreover, it must be borne in mind that Poole, according to the statement of Neuhoff himself, was at least such a responsible person insofar as reputation and appearances were concerned, that Neuhoff became close and intimate enough with him to lend him $300.00, which was not a small amount in view of his average earnings.

Additionally, there is the fact that Neuhoff himself, in his statement to Assistant District Attorney General Butler, corroborated Poole in every detail except that he denied any guilty knowledge of the nature of the checks, and denied that he got $450.00 as Poole claimed.

We think that with the facts it had before it the defendant company had probable cause to prosecute.

With respect to the plaintiff's contention that Poole's statement was "sweated" out of him, and on this account defendant company should have known it was unreliable, and not probable cause, we point out that although Neuhoff testified that Poole made a statement to this effect to him at a time when Mr. Ely was present in the room, Mr. Ely denied hearing any such statement made, and he and General Butler and detective Reasonover all testified this was not true. That Poole was not sweated. But gave his statement voluntarily.

So, while we are obligated to find that Poole made such a statement to Neuhoff, since it is a pure hearsay statement insofar as the truth of the matter is concerned, it cannot be considered as overcoming the testimony of Butler and the other witnesses as to whether Poole had, as a matter of fact, been "sweated". In view of the evidence of all the other witnesses, Poole's statement to Neuhoff does not affect the validity of Poole's confession, involving Neuhoff, as probable cause, insofar as appellant is concerned.

And, since it is the rule, as we have said, that where there is probable cause the state of mind of the prosecutor, whether malicious or not, is immaterial, we must hold immaterial, in passing on this aspect of the case, the statements attributed to Ely at the time of the conference with respect to settling the case, immediately before the trial.

Assuming, as we do, that Mr. Ely said he wanted to get Mr. Neuhoff (which might not have been an unusual thing to say since Mr. Neuhoff was a mature man in his fifties, while Poole and possibly some of the others involved were in their twenties, still, this would not alter the fact that the prosecution was being carried on on probable cause.

This would also be true with respect to the statement attributed to Ely to the effect that he would not object to a suspended sentence for Poole if he would testify against Neuhoff.

These remarks might reflect on Mr. Ely's state of mind at that time, but they do not alter the force of the facts and circumstances showing probable cause.

In addition to being of opinion the defendant company acted upon probable cause, we are also of opinion the company acted on advice of counsel after full disclosure of the reasonably ascertainable facts, and that for this reason, the law being as we have set it forth, the motion for a directed verdict was good.

It would be difficult to conceive of a case more squarely within the advice of counsel rule than this one. From the outset, defendant company consulted with and acted in accordance with the advice of the Assistant District Attorney and the District Attorney General of Davidson County, both of whom are known to be, and admitted to be, fair and honest men who are skilled in criminal law.

The uncontradicted fact is that all of the ascertained and reasonably ascertainable facts were in the possession and in the knowledge of these lawyers, and, while unquestionably the defendant company was in point of fact and law responsible for the prosecution, so that it would have been liable if the prosecution had been malicious, still, it cannot be denied that the probable cause was such, and the facts were such, that this counsel not only advised prosecution but assumed an active role therein.

As indicated, we are of opinion the trial judge should have sustained the defendant company's motion for a directed verdict on the first trial of this case and that he erred in not so doing. Accordingly, we sustain the assignment of error made with respect thereto. This action obviates consideration of assignments based on the second trial. The suit is dismissed, with costs.

Shriver and Puryear, JJ., concur.