Gina PERA, Plaintiff-Appellee-Appellant,

v.

The KROGER COMPANY,
Defendant-Appellee,

and

Valley Fidelity Bank & Trust Company,
Defendant-Appellant.

Supreme Court of Tennessee,
at Knoxville.

Aug. 13, 1984.

Herbert S. Moncier, Knoxville, for plaintiff-appellee-appellant, Gina Pera.

James A. Ridley, Knoxville, for defendant-appellee, Kroger Co.

W.C. Wilson, Knoxville, for defendant-appellant, Valley Fidelity Bank and Trust Co.

## OPINION

HARBISON, Justice.

This action was instituted by plaintiff, Gina Pera, against The Kroger Company for malicious prosecution and defamation and against Valley Fidelity Bank & Trust Company for alleged wrongful dishonor of a check. The defendants were not sued jointly but severally; separate amounts of damages were claimed against each. Joinder was permissible, however, because common questions of fact were presented.

At the conclusion of the evidence the trial judge directed a verdict for The Kroger Company as to all claims asserted against it. The jury returned a verdict against Valley Fidelity Bank & Trust Company in the amount of $50,000, but this was remitted to $10,000 on post-trial motion. Both the original plaintiff and Valley Fidelity Bank & Trust Company appealed. The Court of Appeals affirmed as to all parties and claims. Both the plaintiff and the bank sought review in this Court, which was granted.

Because the issues with respect to the two defendants are different, we will discuss them separately.

### A. The Valley Fidelity Bank & Trust Company Case

Plaintiff opened a checking account with Valley Fidelity Bank & Trust Company in Knoxville on September 29, 1978. She was given a number of "starter" checks for her new account, and when these were exhausted she was given an additional supply of counter checks until her regular printed checks could be prepared and delivered.

On October 14, 1978, she gave one of these counter checks to The Kroger Company in the amount of $17.61 for merchandise purchased at its Chapman Highway store. The signature on this check is very difficult to read. It appears to begin with a capital "D," and the remaining letters of the signature are difficult to decipher. The check was not encoded with an account number, although it did have encoded on it the bank number for purposes of data processing.

Kroger deposited the check in its account at the United American Bank, but when the check was presented to the drawee, it was returned with a notation "unable to locate account." Kroger apparently ran the check through its own account twice, but ultimately it was returned to The Kroger Company without payment. Although the check listed the address, telephone number, date of birth, Tennessee driver's license number and Visa credit card number of the plaintiff, it did not carry her account number. Apparently personnel of the drawee made no independent investigation to ascertain the identity of the drawer, although it had honored all of her other counter checks, including one drawn the day before without an encoded account number.[1]

After the check was returned unpaid, on November 4, 1978, the store manager, Gary Cheatwood, sent to plaintiff a notice and demand letter, as required by the Tennessee worthless check law, T.C.A. §§ 39–3–301 to 309. The letter explicitly warned plaintiff that her check had been returned and that legal action would be taken unless she paid the check within ten days. The letter inaccurately stated that the check had been returned for insufficient funds, rather than "unable to locate account," but

---

1. That check, however, was apparently cashed at the bank, and one of the tellers must have ascertained the correct identity of the plaintiff. In all events someone at the bank wrote the account number in ink on that check, and it was duly honored.

it clearly advised the addressee that her check had been returned unpaid.

Plaintiff received the letter and testified that on two or three occasions she attempted to call the store manager but was unable to reach him. She did not leave her name or any message with him.

Having had no communications from the plaintiff, the store manager turned the check over to the assistant manager, Alfred L. Harrison. Mr. Harrison made telephone calls to the residence of the plaintiff on November 20 and November 28, some two weeks and three weeks respectively, after the letter had been sent to plaintiff and received by her. On one occasion he reached her sister and told her sister that he needed urgently to speak with the plaintiff.

Still having had no response from the letter or telephone calls, Mr. Harrison caused a criminal warrant to be issued against the plaintiff on December 5, 1978. She was arrested several days later. Ultimately her case was bound over to the grand jury and she was indicted. Thereafter, however, the charges were dismissed.

Upon being contacted by personnel from the Sheriff's Department about the warrant, plaintiff called the bank and was advised that it had no record of any of her checks having been returned. She obtained a letter from a vice president of the bank to the effect that she had ample funds to cover the check. She took this to the General Sessions Court on the day when the warrant was served on her and later at a bindover hearing. Representatives of the bank appeared at both hearings and advised both the prosecuting attorney, the trial judges, and representatives of The Kroger Company that the check had apparently not been paid because of the illegible signature.

On appeal it is insisted by the bank that there was no technical "dishonor" within the meaning of the Uniform Commercial Code because it did not return the check for insufficient funds, lack of account or a stop order. The textual comments to T.C.A. § 47–3–510 indicate that there are justifiable reasons for refusing to pay a check which do not amount to evidence of dishonor, such as an illegible signature, lack of a signature or endorsement, forgery, etc. It is the insistence of the bank, therefore, that there was not a dishonor within the meaning of the U.C.C. and that the bank is not liable for any consequential damages resulting from wrongful dishonor as provided in T.C.A. § 47–4–402.

The latter statute makes a payor bank liable to its customer for damages proximately resulting from wrongful dishonor of an item. When the dishonor occurs through mistake, liability is limited to actual damages proved, but these may include damages for an arrest or prosecution of the customer which are shown to have been proximately caused by the dishonor.

As noted in the comments to this section, an action for wrongful dishonor has sometimes been stated as one for breach of contract, and sometimes as being based upon tort.

One of the leading cases on the subject in this state is *James v. Bank*, 105 Tenn. 1, 58 S.W. 261, 51 L.R.A. 255 (1900). In that case the action was analogized to one sounding in tort, but the Court specifically held that the six-months statute of limitations provided for the uttering of slanderous words did not control. *See* T.C.A. § 28–3–103.

Since no other statute of limitations was relied upon in that case, the Court did not attempt to determine the applicable period of time within which such an action must be brought. In the present case, however, the issue is specifically raised. Since we deem it controlling, we need not attempt to decide here whether there was a technical "dishonor" within the meaning of the U.C.C.

The refusal of the bank to make payment occurred on or about October 19, 1978. The letter from The Kroger Company to the plaintiff was dated November 4, 1978. There is no showing that she received it other than within due course, so that certainly within a few days after November 4,

1978, she knew that her check had not been honored. Early in December she was arrested on a warrant based upon a worthless check, and two hearings on that matter were held during December 1978 and January 1979. Subsequently she was indicted by the grand jury, and the criminal charges were not concluded until April 6, 1979. She did not file this action, however, until April 7, 1980, based upon the alleged wrongful dishonor of her check, which had occurred during October 1978.[2]

Both the trial court and the Court of Appeals held that the action against the bank was based upon "contract" rather than "tort" and that it was therefore governed by the general six-year statute of limitations applicable to contracts "not otherwise expressly provided for." T.C.A. § 28–3–109(3). The only authority cited by the Court of Appeals was the case of *McCombs v. Guild, Church & Company,* 77 Tenn. 81 (1882). That case simply repeated the familiar rule that a plaintiff may waive a tort and sue in contract under certain circumstances, but it is not in point with respect to the issues presented here.

There is no question from the complaint and from the record that the gravamen of the action in the present case was mental anguish, humiliation, embarrassment, and damage to reputation. Plaintiff established no special or monetary damages whatever. She claimed to have spent two hundred fifty dollars in 1980 for treatment by a psychologist.[3] Neither the psychologist nor any other medical witness testified, nor were any medical bills or checks in payment thereof introduced into evidence. These alleged medical expenses constituted but a small portion of the claim. The remainder was for loss of reputation and embarrassment. Plaintiff proved no actual expenses in connection with the making of bond or the retention of counsel in the criminal proceedings.

It is well settled in this state that the gravamen of an action, rather than its designation as an action for tort or contract, determines the applicable statute of limitations. In this state the general statute of limitations for personal injury is one year. T.C.A. § 28–3–104. The bank insists that the claim as presented was purely one for personal injuries, that this statute applies and that the claim is time-barred. We agree and dismiss the action against the bank.

The Uniform Commercial Code provides no special or separate statute of limitations for actions against a bank by a customer for wrongful dishonor. There is very little authority on the subject. One of the leading cases is *Smith's Cash Store v. First National Bank,* 149 Cal. 32, 84 P. 663 (1906). In that case the Court specifically held that an action for wrongful dishonor was not governed by the statute of limitations governing actions upon written instruments but by a shorter statute governing contractual obligations not founded upon such instruments. *See* 10 Am.Jur.2d *Banks* § 573 (1963).

The plaintiff insists that the present action is based upon a contract between the bank and its customer and the consequent duty of the bank to honor all properly payable items, including checks. T.C.A. § 47–4–302. *See Memphis Aero Corp. v. First American National Bank,* 647 S.W.2d 219 (Tenn.1983).

The bank does not deny that the action may be brought in contract or in tort, but it insists, properly, that not all contract actions are subject to the six-year statute of limitations. They may be subject to a one-year period for personal injuries or a three-year period for property damage. For example, in the case of *Williams v. Thompson,* 223 Tenn. 170, 443 S.W.2d 447 (1969), it was held that an action against a builder for improper construction of improvements on real property was controlled by the

---

**2.** April 6, 1980 fell on Sunday, so that April 7, 1980 was the anniversary date of the dismissal of the criminal charges. For computation of time, *see* T.C.A. § 1–3–102.

**3.** An information sheet from the psychologist's office stated that Ms. Pera applied for consultation on April 1, 1980 complaining of "career burnout and general ennui."

three-year statute of limitations governing property damages, T.C.A. § 28–3–105, even though the suit was clearly brought for breach of a building contract.

Numerous other cases apply this same principle to personal injury actions. It was held in *Brown v. Dunstan*, 219 Tenn. 291, 409 S.W.2d 365 (1966), that the one-year statute for personal injuries governed an action brought for damage to the plaintiff's reputation as a businessman and citizen. The Court specifically held that the statute of limitations governing personal injuries was not restricted to bodily injury resulting from trauma.

Citing the earlier leading case of *Bland v. Smith*, 197 Tenn. 683, 277 S.W.2d 377, 49 A.L.R.2d 1212 (1955), the Court said:

"The *Bland* case holds in determining the real purpose of a suit the court must look to the basis for which damages are sought. In the case at bar a substantial part of the recovery sought is for damages done to plaintiff's reputation as a business man; father and respected man of society; humiliation, etc. These rights, so alleged to be damaged, are personal and would be included within 'for injuries to the person' as this phrase is used in T.C.A. sec. 28–304".[4] *Brown v. Dunstan*, 219 Tenn. 291, 293–4, 409 S.W.2d 365, 367 (1966).

In the later case of *Carney v. Smith*, 222 Tenn. 472, 437 S.W.2d 246 (1969), it was held that a claim for mental anguish resulting from the desecration of a burial plot fell within the one-year statute of limitations.

■ Obviously a claim against a bank for wrongful dishonor of a check could cause property damage or some other form of injury which might not come within the personal injury statute. No such damages were claimed or proved in the present case, however, and accordingly we are of the opinion that the action was not timely brought. We find unpersuasive the contention of plaintiff that her right of action against the bank did not arise until the

criminal prosecution had been concluded. She knew all of the facts by December 1978, at the very latest, and there is no basis for the application of principles of the "discovery" rules here. An action against a bank for wrongful dishonor arises at the time of the dishonor, without further notice or demand. 10 Am.Jur.2d *Banks* § 567 (1963).

The judgments of the courts below with respect to appellant Valley Fidelity Bank & Trust Company are reversed, and the action as to it is dismissed.

### B. The Action Against The Kroger Company

In her suit against The Kroger Company, appellant sought damages for malicious prosecution and for defamation of character.

■ With respect to the latter claim, however, appellant offered no evidence of specific false or slanderous statements made by The Kroger Company to any individual or business entity. Without evidence as to some specific publication of libelous or slanderous material, and the content of that material, there is no predicate in the record for any separate award against Kroger for libel or slander.

■ In dictum, the Court of Appeals indicated that after the conclusion of the criminal proceedings against appellant, The Kroger Company "put Gina Pera's name in Checkfax," and that appellant might have had a claim for "outrageous conduct."

There is very little evidence in the record concerning Checkfax, and the evidence is very indefinite as to the date when Kroger "put Gina Pera's name" into that system.

Apparently, insofar as can be gleaned from the meager evidence on the point, Checkfax is some sort of national or regional service subscribed to by retail merchants and other businesses giving information concerning persons who may have passed worthless checks or been guilty of other improper business practices. As stated, the record is undeveloped as to the

---

4. Now T.C.A. § 28–3–104.

nature or extent of the services of this company or as to how businesses subscribe to it. Appellant testified that she wrote to the company on one occasion, but no witness from Checkfax was called to testify, by deposition or otherwise.

The manager of the Kroger store, Mr. Cheatwood, testified:

"Q. Concerning Checkfax, sir, when does The Kroger Corporation send a, quote, 'bad check,' end quote, into Checkfax' systems?

"A. It may vary by store as far as how timely it is done. We try to be very timely with it as far as entering it. We have more than one store in Knoxville, which I am sure you are aware of, and we have instances where people hit one Kroger Store and go down the street and hit another so when you get a bad check back, it is advantageous to, all, to get it into Checkfax as soon as possible.

"Q. Okay, and if the policy that you were responsible for at your Kroger Store were followed, this would have been sent to Checkfax very quickly?

"A. Yes, but I am not real sure what time we went on Checkfax. It was sometime during this period. We haven't always been on Checkfax. I am not sure of the day when we actually started Checkfax. We may have just picked it up when we went, you know, started with the company with Checkfax. Checkfax would have to tell you that."

This testimony seems to indicate that appellee entered appellant's name into the system at or about the time appellant's check was dishonored and before the criminal charges had been dismissed. The trial record does not reveal the exact time when this occurred. Appellant testified, however, that immediately after the criminal charges were dismissed she called Mr. Harrison, the assistant Kroger manager, offering to pay the check so that she could "settle this matter and get my credit rating cleared . . . ."

This indicates that appellant knew at the time the charges were pending that her name had already been sent to Checkfax, or at least that her outstanding unpaid check could adversely affect her credit.

Mr. Harrison testified that he did not withdraw the name of Ms. Pera from the system since she never paid the check. He said that after the criminal charges were dismissed she offered to pay the check, but it had been his understanding from his discussion with the District Attorney that she would also give The Kroger Company a release. Since she declined to give the release, Mr. Harrison took no further action.

It was during the fall of 1979, some six months after dismissal of the criminal charges, that another merchant declined to take a check from the appellant because her name was in the Checkfax system to which that merchant subscribed. Appellant then contacted Checkfax and also contacted The Kroger Company. Shortly after she filed this suit in April 1980, counsel for The Kroger Company wrote a letter to counsel for the plaintiff, filed as Exhibit 26 in the trial record, concerning this matter. He stated that appellant had made demand upon Checkfax "to remove the Category 9 classification outstanding against her."

There is no explanation in the record as to what "Category 9" involves or as to what indication or statement Kroger had made to Checkfax in order to have appellant's name entered thereunder.

Counsel's letter, dated May 9, 1980, continues:

"It is my further understanding that your client has made tender and continues to make tender to pay the Kroger Co. the sum of $17.61 which constitutes the purchase price of the groceries that she purchased at the Kroger Co. but for which she has not paid.

"I have advised my client to accept the tender to pick up the check that was returned for insufficient funds. Upon delivery of funds sufficient to cover that check, I will advise my client to remove the Category 9 classification.

"Please tell us of your desires."

Apparently no reply was made to this offer to remove appellant's name upon her paying the nominal sum involved in this case. Apparently, she never has paid it. It was not paid at the time of trial, and judgment was rendered against her for it.

The record is not developed sufficiently to support a claim against Kroger for outrageous conduct, as suggested by the Court of Appeals, even if such a claim had been made.

■ Under the trial record, therefore, any claim which appellant might have against The Kroger Company must rest upon principles governing the tort action for malicious prosecution. Both the trial court and the Court of Appeals held that appellee had probable cause for instituting the criminal proceedings in the first instance. We are of the opinion that this decision was correct. The Kroger Company was in possession of a check which had been twice returned to it from its own bank and which had been returned unpaid from the drawee·bank. The reason given was "unable to locate account." We believe that to any non-banking merchant, this legend would, at a minimum, indicate doubt as to whether the drawer had an account at that bank, or as to whether there were sufficient funds to cover the check.

All that the Tennessee worthless check law requires as evidence of intent to defraud by the drawer is the issuance of a check "payment of which is refused by the drawee ...." T.C.A. § 39–3–302. Such refusal of payment, by statute, creates prima facie evidence and a "presumption" of intent to defraud and of knowledge of insufficient funds in or on deposit with the drawee if the drawer does not pay the amount due after five days written notice.

The Kroger Company in the present case gave ten days written notice and in addition placed two telephone calls to the drawer, all without result or response. Accordingly, in our opinion, there was probable cause for The Kroger Company to institute the criminal proceedings and to have a warrant issued.

A more serious question arises, however, as to the "continuation" of the prosecution after it became known that there had been some sort of misunderstanding or "bank error" as it is called in the record, and that appellant actually did have funds on deposit sufficient to cover the check.

It is well settled in the law of torts that even though one has probable cause to initiate criminal charges, there can be liability for the malicious continuation of a criminal proceeding. Appellant asserted this theory throughout the trial and on appeal, but neither court below considered it in detail.

The governing principles are stated in *Restatement (Second) of Torts* § 655 (1977) as follows:

"A private person who takes an active part in continuing or procuring the continuation of criminal proceedings initiated by himself or by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings."

In Comment *d* it is pointed out that the prosecutor is not liable for any harm which the accused might have suffered in connection with the initiation of the proceedings but only for those incurred during the time when the proceedings "were improperly continued."

An illustration suggested under which liability might arise under this section involves the initiation of a criminal prosecution for alleged theft, but the prosecutor later learns that he had merely mislaid his property. For the purpose of compelling the accused to pay a debt to another person the prosecutor "persuades the prosecuting attorney to proceed with the trial."

A number of cases have arisen involving this principle. *See generally* 52 Am.Jur.2d, *Malicious Prosecution* § 26 (1970).

■ In order for liability to be imposed under this principle, however, the prosecuting witness must have some control over the prosecution. It appears to be well settled that where the instigator has no control over the case once prosecution has

begun, his participation will not subject him to liability. *See Nicholson v. Roop,* 62 N.W.2d 473, 43 A.L.R.2d 1031 (N.D.1954).

As stated in the *Restatement,* Comment c:

"*Active participation required.* In order that there may be liability under the rule stated in this Section, the defendant must take an active part in their prosecution after learning that there is no probable cause for believing the accused guilty. It is not enough that he appears as a witness against the accused either under subpoena or voluntarily, and thereby aids in the prosecution of the charges which he knows to be groundless. His share in continuing the prosecution must be active, as by insisting upon or urging further prosecution. The fact that he initiated the proceedings does not make him liable under the rule stated in this Section merely because he intentionally refrains from informing a public prosecutor, into whose control the prosecution has passed, of subsequently discovered facts that clearly indicate the innocence of the accused, even though they have the effect of convincing him that this is the fact."

Cases in which liability has been imposed under the principles involved here usually involve conduct such as urging a prosecutor to proceed against his own advice or judgment, such as *Ira v. Columbia Food Co.,* 226 Or. 566, 360 P.2d 622, 86 A.L.R.2d 1378 (1961).

In other cases the persistent identification of an accused whose innocence has otherwise been established has been held sufficient. *See Malvern Brick & Tile Co. v. Hill,* 232 Ark. 1000, 342 S.W.2d 305 (1961); *Eastman v. Leiser Co.,* 148 Minn. 96, 181 N.W. 109 (1921); Annot. 66 A.L.R.3d 10, 47 (1975).

In Tennessee a private prosecutor does not control the prosecution. This is left in the hands of the District Attorney and of the Court. *See* Rule 48, Tennessee Rules of Criminal Procedure; *see also* T.C.A. § 8–7–103(1) making it the duty of the District Attorney General to prosecute on behalf of the state every case in which the state is a party or in anywise interested.

■ As previously indicated, The Kroger Company obtained a warrant for the arrest of appellant on December 5, 1978, about seven weeks after the check had been issued. She was contacted by officers from the Sheriff's Department on the evening of December 11, 1978, but arranged not to be taken into custody until the following day. On the morning of December 12 her attorney contacted Mr. Harrison, but the latter told the attorney that he could not accept payment of the check at that time because the matter had already been turned over to the courts.[5]

Mr. Harrison told the attorney for appellant that he would send the check to court on the afternoon of December 12, although the case was not scheduled for hearing at that time. Mr. Cheatwood actually went to court and took the check with him. He showed his entire file to counsel for appellant and also to the prosecuting attorney.

Although the case was not at that time on the docket, a conference was held with a judge of the General Sessions Court and with a representative of the bank, who came to court at the request of appellant. The Assistant District Attorney apparently concluded that the failure of the bank to pay the check was due to some bank error, but he later testified that there seemed to be some factual dispute concerning this and that for that reason the prosecution continued. There is other testimony in the record that because none of the parties would agree at this informal hearing to pay the court costs involved in the criminal proceedings, the General Sessions judge concluded that he had no alternative but to have the warrant executed, appellant arrested, and the case set for further hear-

---

5. There was evidence that the General Sessions judges in Knox County had issued a written order, some two years previously, forbidding prosecutors to accept payment on worthless check charges prior to a hearing, and requiring both the prosecutor and the accused to appear in court.

ing. This was done, and on January 15, 1979, the case came on for hearing before a different General Sessions judge. At that time appellant declined to submit to the jurisdiction of the court for trial, and a preliminary hearing was had.[6] On that occasion seemingly there was a full disclosure of all of the facts made to all of the parties, but again no agreement could be reached concerning the court costs. Both the prosecuting attorney and the General Sessions judge insisted that these must be paid before the case could be dismissed, and neither Ms. Pera, Kroger nor the bank was willing to pay them. Accordingly, correctly or otherwise, the General Sessions judge bound the matter over to the grand jury of Knox County.

This body subsequently convened, and both Mr. Harrison and a Kroger employee who had received the check from appellant appeared and testified.

A different Assistant District Attorney handled the grand jury proceeding. He testified at the trial of this case. He had no knowledge or recollection concerning this particular incident. He testified that he routinely asked a minimum number of questions of the holder of a worthless check, and Mr. Harrison confirmed this. Harrison testified that he simply presented the check, the notice letter and his file. He did not tell the prosecuting attorney or the grand jury that there apparently had been some problem or error made at appellant's bank concerning her check, but no questions concerning this were asked of him. The grand jury indicted appellant but when the matter reached the Criminal Court of Knox County it was dismissed upon motion of another Assistant District Attorney with the approval of the judge of that court. No costs were charged to either of the private litigants involved in the proceedings, and, apparently, they were borne by the State. There is no evidence that Kroger urged that the prosecution continue. When the Assistant District Attorney handling the matter in the criminal court recommended to Mr. Harrison that the

charges be dismissed, Harrison readily agreed. It was Harrison's understanding that Ms. Pera would pay the check and release Kroger from all claims, but when she did not do so, Harrison never undertook to reinstitute the proceedings.

Although in its pleadings The Kroger Company relied upon the defense of advice of the District Attorney, the record fails to sustain that contention. None of the staff members of the District Attorney who testified in the case indicated that they had been consulted by The Kroger Company or had given any advice to that company concerning the continuation or discontinuance of the prosecution. *Cf. Peoples Protective Life Ins. Co. v. Neuhoff,* 56 Tenn.App. 346, 407 S.W.2d 190 (1966).

On the other hand, for obvious reasons of public policy, it is generally held that proceedings before a grand jury are privileged and that a prosecuting witness ordinarily plays only a passive role in appearing before that body. *See generally Rose v. Whitbeck,* 277 Or. 803, 562 P.2d 194 (1977). There is even authority that liability for malicious prosecution will not be imposed for the giving of false testimony before a grand jury. *See Whittaker v. Duke,* 473 F.Supp. 908, 911 (S.D.N.Y.1979).

The principles governing proceedings such as this are stated in a leading authority on torts as follows:

"The defendant may be liable either for initiating or for continuing a criminal prosecution without probable cause. But he cannot be held responsible unless he takes some active part in instigating or encouraging the prosecution. He is not liable merely because of his approval or silent acquiescence in the acts of another, nor for appearing as a witness against the accused, even though his testimony is perjured, since the necessities of a free trial demand that witnesses are not to be deterred by fear of tort suits, and shall be immune from liability. On the other hand, if he advises or assists another person to begin the proceeding,

6. Mr. Harrison was subpoenaed to attend this hearing by counsel for Ms. Pera.

ratifies it when it is begun in his behalf, or takes any active part in directing or aiding the conduct of the case, he will be responsible." W.L. Prosser, *Law of Torts* 836–37 (4th ed. 1971).

We are of the opinion that the evidence does not justify a conclusion that The Kroger Company was sufficiently legally responsible for the continuation of the prosecution or that it had sufficient control over the proceedings to render it liable under the principles of § 655 *Restatement of Torts* 2d, cited above.

It appears that numerous errors may have been made by all concerned in this proceeding, including officials of the criminal justice system. Those officials, however, are immune from suits such as this, and private litigants cannot be held responsible in civil damages for any errors which may have been committed by judges or prosecuting attorneys. A member of the District Attorney's staff and two General Sessions judges were fully apprised of all of the facts of this case during December 1978 and January 1979. That they saw fit to continue the prosecution because of accrued court costs is not the responsibility of the appellee.

The judgment of the trial court and of the Court of Appeals, dismissing the action as to The Kroger Company, is affirmed.

All costs are taxed to appellant. The cause will be remanded to the trial court for entry of any further orders which may be necessary.

FONES, C.J., and COOPER and DROWOTA, JJ., concur.

BROCK, J., files opinion concurring in part and dissenting in part.

BROCK, Justice, concurring in part and dissenting in part.

I concur in the opinion of the Court respecting the action against the bank, but I dissent insofar as the action against Kroger is concerned. It is my view that on the facts as stated in the majority opinion a jury issue was clearly made out on the malicious prosecution count and on the def-

amation by "checkfax" count. I would therefore revise the judgments of the lower courts dismissing the action against Kroger and remand for a new trial.