JOHN N. KLEIN, JR., and DAIRY GOLD, INC.,
Plaintiffs-in-Error, v. DOROTHY ELLIOTT,
Defendant-in-Error.—436 S.W.(2d) 867.

Eastern Section. August 30, 1968.

Certiorari Denied by Supreme Court February 3, 1969.

4

Robert A. Frazier, Spears, Moore, Rebman & Williams, Chattanooga, for plaintiffs in error.

John S. Wrinkle, Chattanooga, for defendant in error.

TODD, J. This is an appeal in error by the defendants, John N. Klein, Jr., and Dairy Gold, Inc., from a jury verdict and judgment in favor of the plaintiff, Dorothy Elliott, for malicious prosecution. Plaintiff also has assigned error in connection with a reduction of the verdict by remittitur.

The present suit grows out of a criminal court proceeding wherein plaintiff was acquitted of a charge of forgery of endorsement upon two checks allegedly owned by defendant, Dairy Gold, Inc.

There is evidence in the record to establish the following facts:

Defendant Klein was the president of defendant Dairy Gold, Inc., which owned or controlled several retail stores dispensing ice cream and other food to the general public. After operating for some time with salaried managers, defendants devised a new "profit sharing plan" as the basis for its relations with the managers of the individual stores. The plan was reduced to writing and placed in the

corporate minutes of Dairy Gold, Inc., but no copy of the plan or minutes was introduced in evidence in this case.

The profit sharing plan included several distinctive features. The premises and equipment of each store were leased to an "operator". Rental was based upon percentage of sales. An inventory of merchandise and $100.00 cash were furnished to the operator to start the operation of the store. All cash receipts were to be deposited in a bank account in the name of the store. Checks drawn on the bank account required the signature of both operator and defendant, Klein. From time to time the operator and Klein were to get together and sign checks to pay operating expenses, salaries and a "weekly draw" to the operator for personal expenses. The profits accumulating in the bank account were to be used to repay Dairy Gold, Inc., for the initial inventory and cash, after which profits would belong to the manager. The arrangement was terminable by either party, in which event Dairy Gold, Inc. would repurchase the inventory and pay the operator inventory value, less any unpaid amount due therefor.

The plaintiff entered into the above described arrangement as operator of stores designated "Dairy Gold No. 1" and "Dairy Gold No. 3", however only "Dairy Gold No. 1" is involved in this suit. The books and records of "Dairy Gold No. 1" were kept at defendant's headquarters by employees of defendant, Dairy Gold, Inc., who also procured privilege licenses, state and federal tax registrations and prepared all tax returns for "Dairy Gold No. 1", listing plaintiff as the owner.

The relations of plaintiff and defendant were without serious problems until January 1963. Plaintiff testified

that she notified defendant Klein on January 24, 1963, that she was terminating the agreement. This was denied by Klein, who testified that he received no notice except that he learned that the store was closed on January 24, 1963.

Plaintiff testified that, when she notified defendant Klein of the termination of their arrangement, he verbally abused her, threatened to prosecute her through a friend in the district attorney's office, and refused to join her in signing checks to pay employees, expenses, and the "draw" due plaintiff. This is denied by defendant Klein.

Plaintiff testified that she paid the employees, herself, and took possession of the cash on hand.

When plaintiff ceased the operation of Dairy Gold No. 1, she retained in her possession a check dated January 1, 1963, payable to "Dairy Gold No. 1" in the amount of $20.24 for percentage of receipts of a cigarette machine on the premises. Plaintiff subsequently obtained possession of another check for percentage of receipts of a "jukebox" on the premises, dated February 1, 1963, in the amount of $43.35. Both checks were endorsed and cashed by plaintiff on or about February 9, 1963.

Plaintiff testified that both of these checks represented income which accrued during her control of the store and, therefore the checks belonged to her with the exception of the rental percentage thereon due defendants, which she had paid. This is denied by defendants who insist that the checks were subject to endorsement by plaintiff only for deposit to the credit of "Dairy Gold No. 1". Defendants insist that plaintiff was guilty of forgery by endorsing and cashing the two checks for her own benefit.

Shortly after plaintiff cashed the two checks as above related, defendant, Klein, consulted the attorney for Dairy Gold, Inc., about the actions of plaintiff, which attorney informed Klein that he was not a criminal lawyer and that the facts should be discussed with a representative of the office of the district attorney. Thereafter, Klein and his attorney consulted with an assistant district attorney who promised to "look into the matter". A short time later, Klein was subpoenaed before the grand jury who returned an "original presentment" signed by all members of the grand jury and charging plaintiff with the offense of forgery in connection with the endorsement and cashing of the two checks previously mentioned.

Upon trial to a criminal court jury, plaintiff received a verdict of "not guilty". Thereafter this suit was filed.

The declaration charged that:

"defendants did falsely, maliciously and without reasonable or probable cause prosecute the plaintiff for the alleged offence of forgery".

"defendants were affirmatively active in instigating the aforesaid false and malicious prosecution * * * in participating in the aforesaid malicious prosecution * * * were instrumental in prosecuting the plaintiff".

Upon being ordered to plead specially under Sec. 20-921 T.C.A. defendants plead:

"that the plaintiff, Dorothy Elliott, while in the employ of Dairy Gold, Inc., wrongfully withheld the proceeds of two checks, one in the amount of $20.24 and a second in the amount of $43.35.

\* \* \* \* \* \*

"defendants * * * were advised by legal counsel to contact and advise the Hamilton County Attorney General's staff".

\* \* \* \* \* \*

"defendants were later subpoenaed to appear before the Hamilton County Grand Jury and did so. The defendants * * * did not prosecute plaintiff but instead she was arrested and held for trial by the Hamilton County Grand Jury."

\* \* \* \* \* \*

"Defendants deny that they falsely, maliciously and without probable cause prosecuted the plaintiff * * * the defendants deny that they acted maliciously or without probable cause * * * but * * * in good faith and with probable cause and with no malice whatsoever. toward the plaintiff."

The plaintiff joined issue upon all affirmative allegations of the plea.

Defendants' first two assignments of error complain of the refusal of a directed verdict on the grounds that:

"A. —there was no evidence that the defendants acted without probable cause.

B. because the undisputed evidence showed that defendants acted with probable cause and

C. upon the advice of counsel in reporting plaintiff's actions to the office of the Hamilton County Attorney General, and

D. because the criminal prosecution of plaintiff was by the office of the Hamilton County Attorney General and not by defendants."

The first two grounds (A and B) will be discussed together.

It is the insistence of defendants that plaintiff was an employee by Dairy Gold, Inc.; that Dairy Gold No. 1 belonged to Dairy Gold, Inc.; that the checks payable to Dairy Gold No. 1 were the property of Dairy Gold, Inc.; that plaintiff had no authority or right to endorse or cash the checks except as authorized by Dairy Gold, Inc., and that her unauthorized actions in endorsing and cashing the checks constituted forgery, or at least reasonable grounds to believe that forgery had been committed. On the contrary, plaintiff insists that under her arrangement with defendants she became and was the owner of Dairy Gold, No. 1; that the checks payable to Dairy Gold No. 1 were her property; and that her cashing the checks instead of depositing them was at most a civil breach of contract for which a civil, not a criminal, action would lie. Plaintiff further insists that the refusal of defendant Klein to countersign checks to pay expenses was a breach of their agreement which released her from its restrictions and justified her in failing to deposit the checks and, instead, in cashing them.

Under the insistence of the defendants, there was probable cause. Under the insistence of the plaintiff, there was no probable cause. The conflicting insistences presented an issue of fact for the jury.

The question of probable cause is a mixed question of law and fact. Whether the circumstances alleged to show it are true and existed is a question of fact for the jury. Whether the facts found to be true constitute probable cause is a question of law for the court. Cooper v. Fleming, 114 Tenn. 40, 84 S.W. 801, 68 L.R.A. 849 (1904). Abbott v. Ledbetter, 1 Tenn.App. 458 (1925).

Nashville Union Stockyards v. Grissim, 13 Tenn.App. 115 (1930). Bankhead v. Hall, 34 Tenn.App. 412, 238 S.W.2d 522 (1951). Where the jury has rendered a general verdict, the appellate court must view the evidence in the light most favorable to the finding of the jury. Abbott v. Ledbetter, supra.

■ Assuming, as we must, that the jury resolved all issues of fact favorably to the plaintiff, then such facts, as supported by the preceding narrative would not, as a matter of law, constitute probable cause. It could not be plausibly argued that any person could be guilty of forgery by endorsing a check payable to a business trade name of the endorser in payment of a debt due to the endorser.

There are adequate grounds, both in law and in fact, to support the finding of the jury against the defendants on the issue of probable cause. Grounds A and B of the first two assignments are therefore to no avail.

C. Defendants strongly insist, in support of their first two assignments, that they are not responsible because they acted upon advice of counsel. Defendants cannot rely upon the advice of corporate counsel beyond his suggestion to consult the Attorney General's office, because corporate counsel testified that he was not competent to advise about criminal charges and so advised his client.

■ The advice of the assistant attorney general or the action subsequently taken by the attorney general is available as a defense only if there was a full and frank disclosure to him of all material facts, without omission or misrepresentation. Nashville Union Stockyards v. Grissim, supra. 54 C.J.S. Malicious Prosecution sec. 48, p 1014.

On the subject of whether full disclosure was made, the defendant, Klein, testified:

"Q. Now, at this conference with the assistant attorney general, did you all go into and discuss all of the pertinent facts of this arrangement existing between Dairy Gold No. 1 and Dairy Gold, Incorporated, and the plaintiff in this case?

A. Yes, sir, we revealed to him all of the arrangements that we had."

"We explained to the attorney general what our profit-sharing plan consisted of, that the operator was set up in each store individually with a *company bank account,* with all deposits being required or all receipts being required to be made to the bank account and we explained that *Mrs. Elliott took the check and converted them to her own use, and also took $100 of change and she also took a hundred and thirty-two dollars of receipts for that week, which totaled, I think, around three hundred dollars, and converted it to her own use, and we thought that perhaps there was fraudulent breach of trust involved, but the attorney general said he thought it was check forgery and we had to go by what he said, not what we said.*"

\* \* \* \* \* \*

We gave the attorney general all the facts we had, all the material we had, books, the checks that were forged, everything we had on this particular case, and we turned it over to him, and he said he would decide if anything needed to be done, that it was not up to us, it was up to the attorney-general."

\* \* \* \* \* \*

"Q. I hand you Plaintiff's Exhibit No. 8 and ask you to look at those and tell us whether both attorneys— whether you told both attorneys about those.

A. These are tax returns, these are quarterly tax returns which we make out on each store, and we make them out in the office for the operators. The operator comes in and writes a check, just like they do on all other expenses.

Q. Did you tell the attorneys that all of those were in the name of Dorothy Elliott?

A. Yes, sir."

\* \* \* \* \* \*

On the same subject, the corporate counsel of defendants testified:

"A. As to the specific facts we advised him—we advised him, to the best of my recollection, as to how the arrangement was set up out there for the writing of checks and the fact that the tax—sales tax forms and so forth were in her name, I believe all this was gone into, explained, some details of the arrangements of the store, *which may I add was not owned by her.*"

"I knew *she was no longer employed* with Dairy Gold. I think *her employment* had ceased sometime in late January, some several weeks before that time, some several weeks before when these checks were cashed in fact.

"After he told me the circumstances of *the checks having been cashed, when she was no longer an employee* and also the fact that they *hadn't* been deposited in *the company's account,* I advised him

that I felt he should consult with the attorney general, that it appeared quite probable to me, even though I am not a criminal lawyer or don't specialize in criminal law, that it appeared quite probable that a criminal offense had been committed here and so I contacted the attorney general's office.

"I contacted Mr. Tarleton Bowles who had at that time—was an assistant to the district attorney general here and told him that I would like to come up with Mr. Klein and discuss this matter with him.

"Some time after that, a week or so after that, we were able to go up at a time convenient to Mr. Bowles and we talked with him, I would imagine, an hour or two, explaining to him the fact of the setup, the way the operation was carried on, *showing to him the checks,* telling him what was known as to their having been cashed and the fact that the funds were not deposited in the company's account and apprising him of all of the facts that we knew that were relevant and answering any questions he asked about it and at that time, Mr. Bowles consulted— did some studying himself in his office there as to what he felt should be done in the matter and asked that the checks be left with him and he would decide what to do."

\*　　\*　　\*　　\*　　\*　　\*

"As to the specific facts we advised him—we advised him, to the best of my recollection, as to how the arrangement was set up out there for the writing of checks and the fact that the tax—sales tax forms and so forth were in her name, I believe all this was gone into, explained, *some details of the*

*arrangements of the store, which may I add was not owned by her."*

\* \* \* \* \* \*

Q. Who owned the store?

A. Dairy Gold, Incorporated.

Q. And with—did you know that the tax returns and everything Mr. Klein has shows that she was the owner?

A. I knew the tax returns were in her name, yes."

\* \* \* \* \* \*

Q. And I will hand you three certified copies from the Secretary of the Treasury marked Plaintiff's Exhibit 6, 7, and 8, and I will ask you to look at those and please tell this jury in your opinion from examining those, whose business this was.

A. Mr. Wrinkle, this is—appears to be evidence of the fact that the Federal tax return on this store was set up in the name of Mrs. Dorothy Elliott. It certainly is not evidence of the fact that she owned the store."

\* \* \* \* \* \*

Q. Now, I hand you Plaintiff's Exhibits 13 and 14, profit from business or profession and look at that and tell the jury in your opinion, as a member of the Chattanooga Bar and one of the best firms anywhere in this state, whether that would indicate that Dairy Gold, Incorporated, owned that business?

A. Certainly this does not indicate that Dairy Gold owned it, but I am telling you that as a matter of fact, that Dairy Gold did own the store and these tax returns were set up in the name of Mrs. Elliott."

\* \* \* \* \* \*

Q. Did you show that to General Bowles?

A. *I don't recall that we actually took him up any papers other than the checks themselves."*

\* \* \* \* \* \*

THE WITNESS: Now, let me say with regard to these tax returns at this time, when we were brought in to discuss them, they were subsequently changed.

I don't believe they are any longer set up this way.

Now, the stores themselves were in the name of Dairy Gold, they are presently in the name of Dairy Gold, and *there was never a deed from Dairy Gold to Mrs. Elliott or did she ever have any property interest.*

Now, with regard to the inventory, the setup was such that from the profits over and above expenses, they were *billed* up as a surplus of profits which would be—which was translated as if it were the purchasing of the inventory or an interest in the inventory.

However, when an employee of one of these Dairy Gold stores—she was paid not the inventory but a lump sum, herself or hisself—himself, representative of an accumulation of surplus profits in inventory. Purchase of inventory was another way of saying that they were accumulating a profit-sharing interest in profits, a vested interest which would be repaid at the termination of employment and this was an incentive-producing device.

Q. When she paid in full, there was no question about her title, in your mind?

A. No, sir, *she would never acquire a title.* In due course, there would be an accumulation of net profits chargeable to her account equal to the value of the inventory.

After that point, she would no longer—there would no longer be a deduction from the gross earnings of the company set aside to be applied towards that inventory.

Q. Who was to reduce this to writing, you or Mr. Moore of Mr. Frazier's firm?

A. *I believe that this was put into the corporate minutes of the corporation.*"

\* \* \* \* \* \*

On the same subject, the assistant attorney general testified:

"I remember this case, however, and I recall having the conference with these gentlemen Mr. Phillips and Mr. Klein, at which, the question arose in this manner; I was acting in the capacity of the assistant district attorney and they were seeking advice as to whether or not there was sufficient evidence for a presentment *on forgery of endorsement.*

"And it then became my duty, acting in that capacity, to listen to all the evidence as they had it, to subsequently check this out on my own, which we did in the cases, because oftentimes, we did not recommend a presentment.

"We did or we did not, depending on what we found out, and to my knowledge, all of the facts involving this matter were presented to me.

"I told them that I would study the matter and advise them. I don't recall how long it was, the time has got away from me a little on that phase of it, but I checked with one or two witnesses, I don't recall whether it was one or two—possibly two, and it then

became my opinion, in my official capacity, that the offense of forgery or endorsement had been committed, and therefore, I permitted the matter to come before the grand jury, and I believe—"

\* \* \* \* \* \*

"THE WITNESS: *I was advised,* Mr. Wrinkle, *that this lady* Dorothy Elliott *was working in some capacity with Dairy Gold,* but the deciding factor or one of the deciding factors, sir, that a criminal offense had been committed was *my understanding that these two checks were cashed some two or three weeks after the relationship of parties terminated and she had no authority to endorse them in any capacity."*

A. I understand, Mr. Wrinkle, that for the last time, try to get this through your head, please, sir, that any relationship she may have had with Dairy Gold No. 1 had ceased prior to the time she cashed the checks, further that the only authority she ever had to endorse a check was for deposit only, and that was the business."

Included in the record is a series of exhibits which include:

U. S. Tax form 9-1—Employers Quarterly Federal Tax Return—Dorothy W. Elliott Dairy Gold Store #1.

State of Tennessee Sales Tax Certificate Dairy Gold Store #1, Dorothy Elliott.

U. S. Tax form 1040-C—Dorothy Elliott Dairy Gold #1.

U. S. Tax form W-3—Reconciliation of Income Tax Withheld from wages—Dorothy W. Elliott Dairy Gold Store No. 1.

A series of checks payable to Dairy Gold Inc., signed Dairy Gold No. 1, Dorothy Elliott, John W. Klein, bearing the notation "rent". The color of ink and handwriting of "rent" appears to be the same as the signature of Klein.

A consent decree in the chancery case of Dorothy Elliott vs. Dairy Gold, Incorporated, containing the following:

"* * * and now it is agreed between the parties that the inventory of Dairy Gold Number Three, at the time it was purchased from the defendant on August the 5th, 1962, was $606.87, and that it was paid for in full, prior to December the 8th, 1962, and *that the inventory at Dairy Gold Number One was $917.26 at the time it was purchased on or about November 3rd, 1962;* that the income tax return for 1962 on Dairy Gold Number Three showed its income to be $920.19, and Dairy Gold Number One to be $531.06; but for Dairy Gold Number One in January, 1963 to January 24th, was a net loss of $56.72; and *that the inventory of Number One at the time it was sold back to the defendant on January 24, 1963,* was, according to the complainant, $900.30, this same inventory, according to the defendant, was $824.88, that the *complainant had withdrawn from her bank account,* while she operated Dairy Gold Number Three, the amount of $775.00, and she had withdrawn from Dairy Gold Number One, $736.80, and on January 24th, 1963, that there were outstanding power and light bills, some unpaid taxes, both State and Federal, some unpaid telephone bills, and a $70.00 bill claimed by the bookkeeper for defendant, for services rendered to Dairy Gold Number One.

"And *it is now agreed that the defendant will pay all of said bills,* including Internal Revenue Service, $87.27; Internal Revenue Service F.I.C.A. Withholding, $14.99; Internal Revenue Withholding Tax withheld, $10.10; Tennessee Department of Employment Security, $6.64; Tennessee Department of Revenue (sales tax), $53.53, making the total, $570.88, and that if said public agencies had a penalty of $43.13, and interest of $41.41, that these amounts will also be paid by the defendant, in full settlement of all matters between them in this case."

It is virtually incontrovertible that, until January 24, 1963, plaintiff was the owner and operator of Dairy Gold No. 1. The land and equipment were rented by her from Dairy Gold, Incorporated, which was entitled to a percentage of receipts as rental. The inventory of supplies and merchandise, as well as all receipts in cash or check, belonged to plaintiff.

From all the foregoing, and other kindred evidence, the jury was justified in finding that the defendants and their counsel had deluded themselves into a conviction that their scheme actually preserved the relationship of employer and employee while bearing all the appearances of individual ownership of the stock of merchandise, cash and bank account, in short, of the business.

Having so found, the jury was justified in concluding that the defendant Klein and his corporate counsel conveyed this delusion of fact to the assistant attorney general, and thus precipitated his conclusion that the offense of forgery had been committed.

It is inconceivable that any reasonably well-informed individual, much less an assistant attorney general, would conclude that forgery had been committed, if fully in-

formed of the pertinent facts of this case. Under this business arrangment, the checks in question belonged to plaintiff, who, at that time, was owner of Dairy Gold No. 1. If she owned the checks, she could not be guilty of forgery by endorsing a check payable to a business enterprise which belonged to her at the time the check was issued, or the obligation arose.

The jury was justified in assuming that no attorney general would initiate a forgery prosecution if informed of the true circumstances. Since he did so proceed, the jury was justified in concluding that he did so under a false impression of the facts, as conveyed to him by defendant Klein.

Defendants rely upon a number of authorities, the pronouncements of which appear to be applicable, but the facts of which distinguish them from the present case.

For example, in Cohen v. Ferguson, 47 Tenn.App. 165, 336 S.W.2d 949 (1959) the defendant owner of an "auto junk yard" relied upon the word of trusted employees and reported certain thefts to the police, who made further investigation before making arrests or beginning prosecution. There was no question of the defendant's failure to disclose information in his possession which would have fully exonerated the accused.

In Peoples Protective Life Insurance Company v. Neuhoff, 56 Tenn.App. 346, 407 S.W.2d 190, the defendant had no first-hand knowledge of the facts at all, but received his information from the prosecuting attorney who had obtained his information from other sources before talking to defendant.

In 87 A.L.R.2d, pages 222, 223 is found the following heading above a lengthy annotation of cases from many states:

"Although advice of counsel is often deemed to be an independent element of defense, separate from that of probable cause, it constitutes in many jurisdictions a part of the larger element of probable cause itself, as a defense to malicious prosecution actions.

"As merely illustrated by the following cases, there is widespread authority to the effect that, at least where the facts are disputed, questions of good faith and full and fair disclosure in seeking the advice of counsel or of the public prosecutor, or good faith reliance thereon, are for the jury. See the following cases apparently recognizing by statement or application in practice the propriety of the exercise of a strong jury function in the area of advice of counsel, the elements held or recognized to be for the jury's determination having been indicated parenthetically."

To the same effect is 34 Am.Jur. Malicious Prosecution, Sec. 163:

"The question whether the defendant fairly presented to the attorney all the facts he knew or ought to have known, and whether he acted in good faith upon the advice received, is a question of fact for the jury where the evidence is conflicting or where different conclusions may be drawn therefrom. * * *"

\* \* \* \* \* \*

"The mere statement of the party instituting the prosecution that he made a full and fair disclosure of the facts is not conclusive. It further must be shown what information was in fact imparted so that the jury may determine whether it was a full truthful statement of all the facts." 54 C.J.S. Malicious Prosecution sec. 49, p. 1015.

In Wilmer v. Rosen, 102 W.Va. 8, 135 S.E. 225, 49 A.L.R. 261 (1926), the defendant plead advice of counsel. The Supreme Court of West Virginia reversed the trial court for setting aside the jury verdict for the plaintiff, and reinstated the verdict, saying:

"Did defendant make a full and fair statement of all the facts to counsel? 'The defendant should show what facts were stated to counsel, in order that it may be determined whether a full and fair disclosure was made.' 19 Am. & Eng.Enc.Law, 687; 38 C.J. 494; 18 R. C.L. 47, 48. What facts defendant disclosed to his lawyer do not clearly appear. He himself says that he presented all the facts; but that is all he says. His counsel says that he showed him a copy of the original agreement between him and plaintiff, and some of the forms of his leases, and explained how the entries were made. But it nowhere appears that defendant told counsel that he had advised plaintiff that the latter had an interest in the profits and right to use a part thereof; and it is not probable that he did so, or the attorney would not have advised him to institute criminal proceedings. * * *"

* * * * * *

"Unless the facts disclosed to counsel are made to appear to the jury, how can they determine whether or not a full and fair disclosure of the material facts was made? * * *" 135 S.E. at 227.

In Kitchen v. Rosenfeld, 44 R.I. 399, 117 A. 537 (1922), it was held:

"Whether the prosecutor acted upon advice of counsel and whether he made a complete disclosure of all the facts and circumstances are questions of fact for the

jury. The mere statement of a prosecutor * * * that he made a full and fair disclosure of all the facts to his counsel, is not conclusive. What he stated should be proven, and the jurors should decide whether the statement made was a full and fair one or not." 117 A. at 538.

To the same effect is North British & Mercantile Insurance Company v. Feldman, 149 F.2d 582, CCA—4th Circuit (1945).

In Barhight v. Tammany—158 Pa. 545, 28 A. 135 (1893) it was held that an incomplete and unfair statement to the attorney warrants an inference that the advice was sought as a mere cover for the prosecution, and an opinion based on such a statement is an unsatisfactory reply to evidence of malice and want of probable cause.

"The omission to state any material fact, although it resulted from an honest mistake of the prosecutor in supposing it not to be material, deprives him of the immunity otherwise obtainable by seeking the advice of counsel. (citing numerous cases). It is clear that an intentional concealment of material facts renders advice worthless." 34 Am.Jur. Malicious Prosecution, Sec. 78, pp. 752, 753.

In the case of Cottrell v. Grand Union Tea Company, 5 Utah 2d 187, 299 P.2d 622 (1956) there was a situation somewhat similar to the present case. Cottrell was an employee who was allegedly short in his accounts, but the amount of the shortage was seriously disputed and Cottrell's wife, an accountant, was about to audit the account for him. Before the audit could be made, the employer went to his attorney who issued a "letter of

probable cause'' and sent the employer to the county attorney who heard the employer and issued a complaint. The employee was exonerated and sued for malicious prosecution. The employer testified that he made a full and fair disclosure to his attorney and the county attorney, and the trial judge directed a verdict for the employer. The Utah Supreme Court reversed and remanded for a jury trial, saying:

''The critical point of inquiry is this: Considering all of the evidence, could reasonable minds fairly say that they were not convinced by a preponderance of the evidence that the defendants made a full and truthful disclosure of the material facts to the county attorney?''

\* \* \* \* \* \*

''The defendants' contention that they made a full and truthful disclosure of facts to Mr. Taylor rests upon the foundation of the testimony of Mr. Pope and Mr. Fives, which Mr. Taylor corroborates in some particulars. Under the facts here, it seems meaningless for defendants to prate that there is 'no evidence to dispute' their claims as to what they did. It is appreciated that under usual circumstances, uncontroverted testimony of credible witnesses may not arbitrarily be disregarded by the trier of the facts. But there are cogent reasons why such rule is not applicable here.

''In approaching a realistic analysis of the present situation, it is of prime significance that the occurrences upon which the claimed full disclosure is based took place outside the plaintiff's presence, and furthermore, were carried on and are now testified to by witnesses whose interests are adverse to him. Under such circum-

stances it would be contrary to reason and justice to foreclose plaintiff from disputing their version of what happened on the ground that their evidence was 'undisputed.' At the disadvantage of being absent when the events took place, the only course open to plaintiff was to expose weaknesses in their story by cross examination or contrary evidence to show uncertainties, inconsistencies or other circumstances which would cast doubt upon the truthfulness of their declarations and support his contention that the prosecution was motivated by personal animus and vindictiveness, rather than legal justification. The inquiry to be pursued, is whether under the evidence, plaintiff succeeded in casting sufficient doubt upon the defendants' story that reasonable minds could fairly reject it.

"[4, 5] The testimony of Mr. Pope and Mr. Fives upon which the defense of full disclosure is primarily based is obviously suffused with a high degree of self-interest. And further, from the dispute which developed over the account, and the fact that Mr. Cottrell was leaving the company and was prosecuted criminally, it would not be going too far to say that an inference of animus could fairly be drawn. Self-interest is uniformly recognized as a factor which may be considered in evaluating or in discounting testimony, and it is not limited to a direct pecuniary stake in the result. The interest which one may have in vindicating his own conduct is also an important factor. Such interest may well have an important bearing, subconsciously as well as consciously, upon both memory and testimony. Each of the witnesses relied upon by the defendants have such motivation.

"The only one of plaintiff's witnesses for whom they can claim any degree of detachment is Mr. Taylor, the Deputy County Attorney. It is to be noted that he was indefinite in his recollections both as to the time certain disclosures were made to him and as to what they were. * * *" 299 P. at 623, 624.

In the present case, the testimony of defendant, Klein, and his corporate counsel that they made a full disclosure is not directly contradicted. In some degree, it is corroborated by the testimony of the assistant attorney general.

■ Nevertheless, as held in the Cottrell case, a party who has no possible means of directly contradicting testimony of a transaction is entitled to impeach such testimony by proof of inconsistent circumstances, among which are:

1. The conclusion of the assistant attorney general that there had been a "termination of authority" was inconsistent with a full disclosure.

2. The action taken by the attorney general was inconsistent with a full disclosure.

3. The alleged disclosure was inconsistent with the factual testimony of Klein and his attorney in regard to ownership.

4. The failure of Klein to exhibit to the assistant attorney general any of the papers evidencing the relationship of the parties, especially the minutes of the corporation describing same.

5. The previously expressed intention to use the friendship of the attorney general to project a prosecution.

The proven contradictory circumstances were sufficient to take to the jury the issue of whether a full and fair disclosure was made to the assistant attorney general. The trial court was therefore entirely correct in declining to direct a verdict for the defendants on grounds of advice of counsel.

Defendants' insistence (C) of their first two assignments is overruled.

█ D. The final insistence under the first two assignments is answered readily as follows:

"One who causes another's prosecution by false statements or misrepresentations, made to a police officer, with an improper motive, is liable for malicious prosecution, although he does not file a complaint or actually procure the prosecution." 54 C.J.S. Malicious Prosecution sec. 17, p. 970.

The pertinent information that plaintiff was the legal owner of Dairy Gold No. 1 was peculiarly within the possession of defendants. Having been informed by defendants that plaintiff cashed the checks without authority, to whom could the attorney general go for further information, except plaintiff herself? Defendants' argument that the attorney general made further investigation is not supported by the evidence, insofar as the ownership of the shop and checks was concerned. The defendants were the instigators of the prosecution in spite of their efforts to insulate themselves from the risks incident to an unjustified prosecution.

Defendants' insistence (D) is overruled.

Each and every supporting proposition having been rejected, the first two assignments of error are respectfully overruled.

In their third assignment of error, defendants complain of the refusal to grant a mistrial on grounds of misconduct of counsel. As stated in defendants' brief:

"The record is replete with instances where, after objections were made and sustained, counsel for plaintiff deliberately and persistently placed before the jury matters which the court had excluded."

Each such instance of improper disclosure to the jury has been examined in the record. The trial judge displayed appropriate and commendable patience and firmness in dealing with a most difficult situation. The particular matters disclosed were not of critical effect, and the jury was repeatedly admonished to disregard evidence which had been excluded. It does not sufficiently appear that the verdict of the jury was the result of any such improper disclosures. In fact, it is more probable that the attitude of the jury was influenced adversely to the plaintiff by the constant necessity for the court to admonish counsel.

The holdings of our courts on this question are summarized in the case of Swift v. Wimberly, 51 Tenn.App. 532, 370 S.W.2d 500 (1963) wherein this Court said:

" 'While a number of these cases hold, at least by inference, that if a plaintiff or his counsel persist in seeking to improperly influence the jury by voluntary references to liability insurance a mistrial should be granted, in none of them was a judgment actually reversed except in Mfg. Co. v. Woodall, 115 Tenn. 605, 90 S.W. 623, decided before the Act of 1911, now Code section 10654 (sec. 27-117) T.C.A., referred to above.' '' Woods v. Meacham, 46 Tenn.App. 711, 736, 333 S.W.2d 567, 578; Seals v. Sharp, 31 Tenn.App. 75, 80-81, 212 S.W.2d 620.

"In Potts v. Leigh, 15 Tenn.App. 1, DeWitt, J., speaking for the Court of Appeals, Middle Section, said:

'This question of error in allowing evidence that defendant had liability insurance to be brought before the jury arises frequently in such actions, and calls for treatment according to the circumstances of each case.' Potts v. Leigh, 15 Tenn.App. 5."

■■ The allowance or denial of mistrial (new trial) on grounds of misconduct of counsel is discretionary with the trial judge, and that discretion will be reviewed only in exceptional cases. Prewitt-Spurr Mfg. Co. v. Woodall, 115 Tenn. 605, 90 S.W. 623 (1905). In view of the harmless error statute, T.C.A. Sec. 27-117, and the lack of showing that the misconduct actually affected the outcome of the trial, there can be no reversal on this ground.

Defendants cite Pullman Co. v. Pennock, 118 Tenn. 565, 102 S.W. 73 (1907), but that case involved an excessive verdict resulting from the improper reference to the amounts of verdicts in other similar cases. Defendants make no complaint as to the amount of the verdict, as reduced in this case.

Defendants' third assignment of error is respectfully overruled.

Defendants' fourth assignment of error complains of a section of the charge of the court as follows:

"probable cause can be shown where the prosecutor must, in good faith, honestly believe the accused to be guilty of the crime charged, and it must be based on facts and circumstances sufficient to lead an ordinary, prudent person to believe the accused was guilty of the crime charged."

Defendants concede that the foregoing is a correct statement of the law in the abstract, but insist that it is incorrect and misleading when applied to the evidence in this case. Defendants contend that they honestly believed plaintiff was guilty of some criminal offense, but did not particularly believe that forgery was the offense. Defendants urge that the foregoing charge authorized the jury to find for the plaintiff on the ground that defendants did not honestly believe plaintiff was guilty of the particular offense with which she was ultimately charged.

First, let it be noted that this section of the charge says: "probable cause *can* be shown, etc." The use of the word *can* is permissive, and not exclusive. That is, it conveys the meaning that probable cause can be shown by honest belief, supported by sufficient grounds, but that this is not necessarily the only way of showing probable cause. If the charge had employed the words "can only be shown", or "must be shown" by a particular means, the complaint of defendant would have more weight, but such language was not used.

██ In reality, the complaint is that the charge did not completely state the law of probable cause. Where the instruction is meager or inadequate on any point, it is the duty of the aggrieved party to offer special requests for further instructions. Thomas v. Harper, 53 Tenn.App. 549, 385 S.W.2d 130 (1964); Garner v. Maxwell, 50 Tenn.App. 157, 360 S.W.2d 64 (1961).

██ Furthermore, a reading of the entire charge discloses that same was eminently fair to the defendants. The court charged that, in order to recover, plaintiff must prove want of probable cause by a preponderance of all the evidence. The charge also contained the following:

"The question is not whether or not the plaintiff was really guilty, but was there good and reasonable grounds for the prosecutor to believe she was.

"If you find from the proof that the defendants at the time the prosecution ended—instituted, acted upon such a state of facts upon them or from reliable source of information as would induce the belief and the mind of a prudent person that a crime has been committed and by the person he was about to prosecute, then under these circumstances, there would be no liability."

It is true, as contended by defendants, that liability for malicious prosecution should not turn on fine technical distinctions, as where an accused was charged by public officials with the wrong offense. The liability of defendants in this case did not turn upon a fine technical distinction. If defendants had made a full disclosure, it would have been conclusively evident that the accused was the legal owner of the checks and/or funds allegedly mishandled, and, therefore could not be guilty of any crime in mishandling her own property.

"* * * the fact that the charge of which the accused was acquitted was not the one on which he was arrested as a result of information furnished by defendant does not relieve the defendant from liability if he did not fairly and fully state the facts to the prosecuting attorney, where the second charge was based on the same facts. * * *" 54 C.J.S. Malicious Prosecution sec. 17, p. 970.

So, in the present case, where the jury found an inadequate disclosure, it is no defense that the attorney general saw fit to prosecute upon a different charge from the one the accuser had in mind, if both charges were based upon

the same misleading information. In this case, at least, it is the misleading inadequate disclosure that furnishes the gravamen of the action for malicious prosecution, and not the levelling of a specific accusation.

The fourth assignment of error is respectfully over-ruled.

█ The fifth assignment complains of the following instruction to the jury:

"If a person's belief that a certain existing facts constitute a crime or wrong, when they in reality do not, does not justify the institution of proceedings against another, and such a belief will not shield from liability the person bringing the action."

Counsel concedes that this is almost a verbatim excerpt from Dunn v. Alabama Oil & Gas Co., 42 Tenn.App. 108, 299 S.W.2d 25 (1956), but urges that this authority be reversed in deference to Prosser on Torts, 3rd Ed., p. 861, and 25 Tenn.Law Review 316. The rule announced in the Dunn case appears to be the majority rule, supported by annotation at 65 A.L.R. 243 and a previous decision of our Supreme Court in Hall v. Hawkins, 24 Tenn. 357 (1844). Regardless of whether the rule is just in application to all situations, the facts of this case do not justify any clarification or limitation of the rule. The defendants claim that they honestly believed that plaintiff dealt unlawfully with property which was not her own, when defendants knew, and should have disclosed that the plaintiff was dealing with her own property.

Defendants further insist that the charge, as above quoted, deprived them of the defense of the advise of counsel. This defense has been discussed at great length heretofore, where it was pointed out that the jury's

verdict included a finding that defendants had not made a full disclosure, thus eliminating the defense of advise of counsel.

Defendants' fifth assignment of error is respectfully overruled.

Defendants' sixth assignment of error complains of the following charge:

"Now, ladies and gentlemen, on the question of whether or not the defendants may rely on the defense that they were acting under the advice of counsel or other public officers, the Court charges you that if the defendants caused by false statement or misrepresentation made to a public officer or attorney—with an improper motive, then defendants would be liable for malicious prosecution."

The ground of this assignment is that no false statement was made to the public prosecutor. This question was fully discussed and disposed of in connection with the first two assignments.

Defendant's sixth assignment of error is respectfully overruled.

This controversy originated when the defendants sought to create an anomalous situation of apparent title without ownership, of agreed sale without transfer of interest, of responsibility to government and creditors without corresponding benefit of proprietorship. This attempt at an impossibility was complicated by restricting agreements to oral conversations, yet committing the results to records and reports.

Whatever the motives of the defendants in creating their plan of operation, or in the manner of carrying

the plan into effect; the result was natural, and reasonably to be anticipated, namely, misunderstanding, controversy, litigation, and damages.

The plaintiff's first assignment of error concerns the action of the trial judge in suggesting a remittitur. The jury assessed $2,500.00 compensation and $27,500.00 punitive damages. The trial judge suggested a remittitur reducing the punitive damages to $3,500.00.

 Exemplary or vindictive damages, though clearly wrong in theory, are established as the rule in Tennessee. Dougherty v. Shown, 48 Tenn. 302 (1870).

 While the jury initially determines the amount of punitive damages, if any, to be awarded, the statute, Secs. 27-118, 119, T.C.A. entrust to the trial judge, and, on appeal to the Court of Appeals, the review of the amount assessed. If the plaintiff is unwilling for the courts to review the amount of the award, he has the option of a new trial before another jury. This option was not exercised in the present case, hence both the trial court and this court are authorized to review the verdict under the statute.

 A number of cases have been cited wherein various rulings have been made upon various amounts of punitive damages. Each award of damages must rest upon the peculiar facts of the particular case. The actions of the defendants herein were not so totally reprehensible as to warrant devastating punishment. The verdict of the trial jury was excessive. The trial judge was correct in suggesting the remittitur that was suggested. The reduced verdict of $3,500.00 for punitive damages is adequate vindication of such public interest and policy as is inherent in the case.

Plaintiff's first assignment of error is respectfully overruled.

Plaintiff's second assignment of error is:

"The trial judge erred at Be. 217-220 in striking the testimony of the plaintiff Dorothy Elliott in regard to her seeking psychiatric treatment and going to the Guidance Clinic, etc. * * *"

The transcript contains no motion for a new trial on behalf of plaintiff. The Order of the trial court entered on February 9, 1968 recites that the plaintiff's motion for a new trial was overruled, but this is clearly an inadvertence, as the order was entered to dispose of defendants' motion for a new trial.

Alleged errors in the admission or exclusion of evidence are considered on appeal only where called to the attention of the trial court in a motion for a new trial. Yellow Bus Line v. Brenner, 31 Tenn.App. 209, 213 S.W.2d 626 (1948). Rules of Court of Appeals, 12 (5).

Plaintiff's second assignment of error is respectfully overruled.

All assignments of error have been considered and overruled. The judgment of the trial court is affirmed. The costs of this appeal are assessed against the plaintiffs-in-error.

Affirmed.

Shriver, P. J. (M.S.), and Puryear, J., concur.