HENRY MITCHELL, Plaintiff-Appellee, v. HOWARD GEORGE, Defendant-Appellant. —474 S.W.2d 131.

Middle Section. July 30, 1971

Certiorari Denied by Supreme Court December 6, 1971.

C. Allen High, Nashville, Tenn. for plaintiff-appellee.

Howard F. Butler, Nashville, Tenn. for defendant-appellant.

PURYEAR, J.   This is an appeal in error by the defendant, Howard George, from a jury verdict in favor of plaintiff, Henry Mitchell, for damages for malicious prosecution. The present suit grows out of a Criminal Court proceeding wherein plaintiff was acquitted in the Criminal Court of Davidson County, Tennessee, upon a charge of assault with intent to commit murder.

During the pendency of the criminal proceeding plaintiff spent sixty-two days in the County Jail awaiting trial.

The plaintiff and defendant first became acquainted with each other in the year 1961, at which time defendant was operating a warehouse in Nashville, Tennessee, and the plaintiff was serving a sentence for murder in the State Prison at Nashville. At some time in the year 1961 a State Parole Officer requested defendant to interview plaintiff at the State Prison for the purpose of determining whether or not he would provide plaintiff with employment in the event the Parole Board saw fit to parole him.

As a result of this interview, plaintiff was placed on parole and employed by defendant to work at defendant's warehouse in Nashville and this relationship of employee and employer continued until the 13th day of July, 1966, at which time plaintiff became involved in an altercation at defendant's warehouse as a result of which plaintiff was arrested and charged with the offense of assault with the intent to commit murder of which charge he was later acquitted at some time in September, 1966.

On January 27, 1969, plaintiff filed the instant suit against defendant for $25,000.00 damages for malicious prosecution.

To the declaration the following plea was filed by the defendant:

"Defendant, Howard George, for plea to the declaration filed against him, says:

That he acted upon the advice and the instructions of the then District Attorney General, the Honorable Harry G. Nichol, in the procurement of said warrant

against the Plaintiff; that the same was done with probable cause and he is not guilty of the matters and things alleged in the plaintiff's declaration."

(Tech. Rec. p. 5)

On the 4th and 5th days of November, 1970, this case was tried in Circuit Court and at the conclusion of all evidence in the case, defendant moved the Court for a directed verdict, which was overruled, and the case submitted to the jury. The jury found the issues in favor of plaintiff and awarded him damages in the sum of $2,-200.00. Defendant filed a motion for new trial, which was overruled, and this appeal in error resulted.

Defendant has filed six assignments of error, the third and fourth of which raise interrelated questions, so we will consider them together. These two assignments are as follows:

## III

"The proof showing that the plaintiff-in-error acted upon the advice, directions and instructions of the Attorney General in the issuance of the State's warrant, after all material facts relating to the case, ascertainable by the exercise of due diligence, had been adduced by the Attorney General in the presence of plaintiff-in-error; and the plaintiff-in-error having acted upon such advice honestly sought, and after such directions and instructions, is entitled, as a matter of law, to immunity from damages as for malicious prosecution; and the Court should have directed a verdict for plaintiff-in-error upon said grounds.

## IV

(a) There is no evidence to sustain the verdict of the jury.

(b) The law and evidence preponderate against the verdict of the jury and in favor of plaintiff-in-error.''

We cannot consider subdivision (b) of the fourth assignment because it has been held that an assignment to the effect that a verdict is contrary to the evidence cannot be considered in a case where there is a jury verdict approved by the trial Judge. McBee v. Williams (1966), 56 Tenn.App. 232, 405 S.W.2d 668; John L. Burns, Inc. v. Matheney (1964), 53 Tenn.App. 475, 384 S.W.2d 51; Lyman v. American National Bank & Trust Co., (1961), 48 Tenn.App. 328, 346 S.W.2d 289.

In considering the third assignment and subdivision (a) of the fourth assignment, we are bound by the rule which requires this Court to look to all of the evidence, to take the strongest legitimate view of it in favor of the plaintiff, to allow all reasonable inferences from it in his favor; to discard all countervailing evidence, and if then, there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence such assignments must be overruled.

However, we are also bound by the rule that if there is no material and determinative evidence to support the jury verdict for plaintiff, then these two assignments must be sustained. Cude v. Culberson (1947), 30 Tenn. App. 628, 209 S.W.2d 506; Camurati v. Sutton (1960), 48 Tenn.App. 54, 342 S.W.2d 732; Nicholas v. Provident

Life & Acc. Ins. Co. (1970), 61 Tenn.App. 633, 457 S.W. 2d 536.

The uncontroverted evidence shows that when the altercation between plaintiff and Norris occurred, the defendant was at home and was notified of the occurrence of such altercation by his son, who was at defendant's place of business.

Immediately after being so notified by his son, the defendant contacted George H. Curry, an investigator for the District Attorney General for Metropolitan Nashville and Davidson County, and requested Curry to meet him at the warehouse.

After defendant and Curry arrived at the warehouse Curry questioned some witnesses and then took possession of a knife which was owned by the plaintiff.

The uncontroverted evidence also shows that before obtaining a warrant for the arrest of plaintiff, Mitchell, the defendant and Curry went to the office of the District Attorney General, who at that time was Honorable Harry G. Nichol, taking with them two eye witnesses, namely, Rufus Norris and Fred Gates, and while the plaintiff was detained at some other place in the Metropolitan Courthouse, the defendant, together with Norris, Gates and Curry, went into the office of the District Attorney General where Norris and Gates related to the Attorney General what they had seen and heard.

The defendant testified as follows:

"Q. Mr. Curry was conducting the investigation?

A. That's correct.

Q. And he did conduct it?

A. That's right.

Q. Now, where did you all go, Mr. George?

A. Mr. Curry took us in his automobile down to Mr. Nichol's office, who happened to be District Attorney.

Q. Did you go to his office?

A. Yes, we did. And Mr. Gates and Norris, Rufus Norris, were brought in and they both made a statement to Mr. Nichols, a sworn statement as to what happened. And then Mr. Nichols says, 'We will swear out a warrant for him.'

MR. HIGH: I object. It is out of the presence of the defendant. It is objected to on the same basis.

THE COURT: I think that's correct.

MR. BUTLER: This is part of his defense; what he was instructed to—

MR. HIGH: He said that he said. I take it he is here and can testify.

THE COURT: It is not what he said, but was he acting on the advice of some sort.

MR. BUTLER: That's exactly right.

THE COURT: But not what Mr. Nichol told him.

Q. Was General Nichol then the District Attorney General of the county?

A. He was.

Q. Did he advise you what to do?

A. Yes, sir.

Q. Did you do anything other than what he told you to do?

A. No, sir.

Q. What did you do?

A. Mr. Nichol—

Q. No, don't tell what Mr. Nichol told you. What did you do in response to General Nichol's instructions?

A. We went before a Judge and a warrant was sworn out and I signed a warrant. He told me to sign a warrant and I signed it.

Q. Now, that was after General Nichol had taken sworn statements from who all now?

A. From Fred Gates and from Rufus Norris.

Q. You weren't there and you don't know what happened, did you, Mr. George?

A. No, sir.

416

Q. You did this on the advice of the District Attorney General?

A. Yes.

Q. And the instructions of the District Attorney General?

A. That's correct."

(B. of E. pp. 62, 63, 64)

Rufus Norris testified as follows:

"Q. Now, on July 13th, 1966, Mr. Norris, when this trouble occurred out there in this warehouse tell his Honor and this lady and gentlemen of the jury what occurred, please, sir?

A. Well, that morning I had a radio turned on and he asked me who told me to turn it on and I told him I turned it on myself.

Q. Wait a minute. Let's stop right there. Was there some kind of religious program playing at that time, or did you turn the radio on yourself?

A. I turned it on myself.

Q. And he said, 'Who told you to turn the radio on?'

A. Yes, sir.

Q. And go ahead from there?

A. And I turned around, getting up some merchandise, and I went to raise up and he knocked my hat off my head and I looked around to get the hat and he had a knife.

Q. Don't go too fast. You say he knocked your hat off your head?

A. Yes, sir.

Q. Well, did he hit the hat?

A. He hit me to the side of the jaw, face, and knocked the hat off.

Q. And knocked your hat off?

A. Yes, sir.

Q. Is that all you said, that you just turned the radio on yourself?

A. Yes, sir.

Q. And he did that without saying anything further?

A. He asked me who told me to turn it on.

Q. And that was said?

A. Yes, sir.

Q. The next thing you knew he had hit you up to the side of the jaw?

A. Yes.

Q. After your hat fell on the floor what happened?

A. I went to pick it up and looked around and he had a knife and told me not to pick it up.

Q. He had a knife and what?

A. Told me not to pick my hat up.

Q. Was the knife open or closed?

A. Oh, yes, it was open.

Q. He had it in his hand?

A. Yes.

Q. How far apart were you all when he told you not to pick your hat up and had that knife, open knife in his hand?

A. He was right to side of me. Just right the side of me there.

Q. Give us some idea so we can put it in the record there in footage, please, Rufus?

A. Oh, it's about like that.

Q. All right now, you are measuring about a foot and a half or two feet by your hands; is that about right?

A. Yes, sir.

Q. Did you pick it up when he told you not to?

A. No, sir, I didn't.''

(B. of E. pp. 70, 71, 72, 73)

\* \* \* \* \* \*

"Q. When you all left the place of business, where is the first place you went, Mr. Norris?

A. We came back over here to one little place, I don't know where. General Nichol I believe it was.

Q. Did you give him a sworn statement in writing of what occurred out there at this place?

A. Yes, sir, I did that.

Q. Up until that time had you all been before any Judge?

A. No, sir.''

(B. of E. pp. 78, 79)

Fred Gates testified as follows:

"Q. Tell the Court and the ladies and gentlemen of the jury what you saw there, Mr. Gates?

A. Well, I was working that particular morning—

Q. Wait until the siren gets over. Okay.

A. I was working that particular morning right behind them when there was words, and I turned around and looked and Mitchell and Rufus Norris was standing up facing each other. And Norris's cap was laying on the

floor. So I turned around and picked up the cap and give it to him.

Q. Did you see the lick that knocked the cap off?

A. No.

Q. Your back was turned?

A. Yes.

Q. What did you do?

A. I walked between them and picked up his hat and give it to him.

Q. When you walked between them what if anything did Mitchell have in his hand?

A. Well, he had something in his hand but I didn't pay much attention what it was.

Q. Did you see his hand go in his pocket and come out?

A. His hand was already out of the pocket when I came over there.

Q. What did you do when you say, as you indicated that you walked between them?

A. Well, I left and walked away. I didn't want to be involved.''

(B. of E. pp. 80, 81, 82)

\* \* \* \* \* \*

"Q. On this day this incident occurred did you or not, Mr. Gates, go with Mr. George and with Norris to the District Attorney's Office the very same day it happened?

A. It seem like we did.

Q. All right. Now, when you went there did you or not give a statement to General Nichol the very day this occurred out there?

A. Yes, sir, I told him the same thing I just got through telling you about what I seen and what happened."

(B. of E. p. 86)

George Curry testified as follows:

"Q. What did you find when you got there, Mr. Curry?

A. When I arrived there Mr. George met me and told me there had been a problem with an employee. And I went with Mr. George back into the warehouse to meet the employee.

Q. This Mitchell, do you remember him?

A. Yes.

Q. All right, what happened after you got back there?

A. Mr. George—I'm going to have to get some hearsay in.

Q. Let me ask you this. Did you get some information from both Mr. George and his son?

A. Yes, sir.

Q. What did you do when you went back to talk to this man Mitchell here, Henry Mitchell?

A. Eventually I placed him under arrest, or took him into custody and took him to General Nichol's office.

Q. Now, did you search him out there?

A. Yes, sir.

Q. What did you find if anything at the time?

A. General, I'm going to have to make a correction on that. I can't remember whether I searched him or whether it was handed over to me. But I received a knife at that time.

Q. All right now, describe that knife and the condition it was in?

A. It was a knife, a bone-handled-type knife—

MR. HIGH: I think the knife itself would be the best evidence, and I take it that the Police Department has it. It was turned over to them.

THE COURT: I don't know whether they have it or not if there was a not-guilty verdict in it. I don't think they are allowed to keep things after a not-guilty verdict is turned in. Do you know where the knife is?

THE WITNESS: I have no idea.

Q. Describe what the knife looked like?

A. It was a knife with about a three-inch blade. It had a matchstick or a toothpick down between the blade and the body of the knife.

Q. What was that for, Mr. Curry?

A. Well, it's commonly used so you can open the blade quickly with a fingernail or your trousers as the knife is pulled out.

Q. In other words the blade, whatever that is, a toothpick or whatever it is under it, the match stem or whatever it is, that holds the blade up, does it not?

A. Yes, sir.

Q. And where it is easy to get hold of?

A. That's correct."

(B. of E. pp. 89, 90, 91)

Added to this testimony is the fact the plaintiff admitted that he knocked Norris's cap off, but testified "it was just funning . . . it wasn't no violence or nobody was hurt" and denied that he ever took his knife out of his pocket.

However, Norris testified that when the altercation occurred, ". . . it wasn't no fun there."

This testimony of plaintiff, Mitchell, that the altercation was "just funning" and his denial of Norris's testimony that he ever took his knife out of his pocket do not alter the validity of the disclosure of facts made by Nor-

ris and Gates to the District Attorney General, but on the contrary, his admission that he knocked Norris's cap off tends to corroborate the testimony of Norris.

At the time the prosecution was commenced, Honorable Harry G. Nichol was District Attorney General in Davidson County and he testified as follows:

"THE WITNESS: Mr. George advised me that the men with him were employees at his place of business. That there had been a little affair out there involving a third employee. That employee was not in the office. He told me the circumstances under which the third employee happened to be working at his place, and he told me about what the others had told him that occurred. Well—

THE COURT: Now, that part I will sustain your objection, Mr. High. When he gets into what somebody else said.

MR. BUTLER: He's not going to tell that.

THE WITNESS: I then turned and interrogated the two colored men in the office. One of them told me, stated what had happened. And he gave a statement of the case. Then I turned and asked the second one what had occurred out there, and he told me. I then asked was there anyone else present. They said yes, there was a third one but he was out on a truck at that time and did not come to the office. I then had one of the secretaries to go get me a card in our office, record card which we keep on file of a goodly number of people in Davidson County, and they brought me the record

card and file on a man that the two witnesses said had attempted to cut another one there with a knife.

MR. HIGH: Of course, Your Honor please, we ask the jury to disregard the statement of what the two wit- nesses said.

THE COURT: That's right. I sustain that objection.

THE WITNESS: After examining that card and having interrogated the two witnesses I then told Mr. George and the two men. 'You will have to go to the Judge in the General Sessions Court and get out a warrant for that assault.' At that time Mr. George says, 'Who gets out the warrant?' I told him, I said, 'You are the employer,' and he had previously made the statement he wanted to protect his employees, and I said, 'You can get it out or the man that was assaulted get it out, either one of you.' I said, 'Now, General Sessions Court is on the same floor and the Grand Jury is fixing to get in session.' So they left with the directions to go to the Judge in General Sessions Court.

Q. Now, did you instruct, was it upon your advice and your instruction that this warrant was obtained?

MR. HIGH: I object, if your Honor please. Calling for a conclusion on the part of the witness.

THE COURT: I think that's right. That is what the jury is going to have to decide. It can be rephrased, but they are going to have to decide.

Q. What did you instruct Mr. George to do?

A. I instructed Mr. George and the man who stated he was assaulted to go to the General Sessions Court to get out a state warrant for the assault. When they left I didn't know which one was going to get it out. They asked me and I said, 'Either one of you have got a right to get it out; you, the employer, or the man assaulted.'

Q. At that time you were the District Attorney?

(B. of E. pp. 100, 101, 102, 103)

Despite the fact that there are some minor discrepancies in the testimony of Norris, Gates and the defendant, the uncontroverted testimony shows that before commencing any prosecution against plaintiff, the defendant requested Curry to make an investigation after which investigation he and Curry took the only two eye witnesses (so far as this record discloses), with the exception of plaintiff himself, to the District Attorney General, to whom these two witnesses made statements, either oral or written, which convinced the District Attorney General that there was probable cause to prosecute plaintiff upon a charge of assault with intent to commit murder.

Being convinced that such probable cause existed, the District Attorney General advised the defendant to obtain a warrant and commence prosecution of plaintiff.

■ These facts having been established by uncontroverted evidence upon which the minds of reasonable persons could not disagree, the question of whether or not defendant had established the defense of reliance upon

the advice of counsel then became a question of law for the Court and not a question of fact for the jury.

■ It has been held that where the advice of counsel has been honestly sought on all the material facts relating to the case, ascertainable by due diligence, and a prosecution is commenced on such advice the prosecutor is entitled as a matter of law, to immunity from damages for malicious prosecution. Peoples Protective Life Insurance Co. v. Neuhoff (1966), 56 Tenn.App. 346, 407 S.W.2d 190, Cooper v. Flemming (1904) 114 Tenn. 40, 84 S.W. 801, 68, L.R.A. 849.

Also in Peoples Protective Life Insurance Co. v. Neuhoff, supra, it was held that the District Attorney General is counsel whose advice can constitute a defense to an action for malicious prosecution, where based upon a full and honest presentation of the material, ascertainable facts.

The instant case is easily distinguishable from Klein v. Elliott (1968), 59 Tenn.App. 1, 436 S.W.2d 867, because in the Klein case there was conflicting evidence on the question of probable cause and full disclosure of all ascertainable facts to the Assistant Attorney General whose advice was sought.

In Klein, supra, this Court pointed to the following facts, together with other facts, as being inconsistent with a full disclosure:

"The alleged disclosure was inconsistent with the factual testimony of Klein and his attorney in regard to ownership. The failure of Klein to exhibit to the

assistant attorney general any of the papers evidencing the relationship of the parties, especially the minutes of the corporation describing same. The previously expressed intention to use the friendship of the attorney general to project a prosecution."

436 S.W.2d supra, p. 879

At another point in the opinion in that case this Court said:

"It is inconceivable that any reasonably well-informed individual, much less an assistant attorney general, would conclude that forgery had been committed, if fully informed of the pertinent facts of this case. Under this business arrangement, the checks in question belonged to plaintiff, who, at that time, was owner of Dairy Gold No. 1. If she owned the checks, she could not be guilty of forgery by endorsing a check payable to a business enterprise which belonged to her at the time the check was issued, or the obligation arose.

The jury was justified in assuming that no attorney general would initiate a forgery prosecution if informed of the true circumstances. Since he did so proceed, the jury was justified in concluding that he did so under a false impression of the facts, as conveyed to him by defendant Klein."

436 S.W.2d supra, p. 876

██ For the foregoing reasons, the third assignment and subdivision (a) of the fourth assignment are sustained, the judgment of the trial Court is reversed, and

the suit is dismissed, with costs adjudged against the plaintiff-appellee.

This action makes it unnecessary for us to consider any of the other assignments of error and they are pretermitted.

Shriver, P.J.(M.S.), and Todd, J., concur.